## McCALLUM v. CORN PRODUCTS CO.

(Supreme Court, Appellate Division, First Department. April 8, 1909.)

1. TAXATION (§ 119*)—CORPORATIONS IN PROGRESS OF REORGANIZATION—STOCK HELD BY HOLDING COMPANY.

A part of the stock of corporations held by a holding company, pursuant to a plan of reorganization of the corporations, which is in progress, whereby the holding company is to acquire their entire stock is as much subject to a tax as is stock held by any other owner.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. § 215; Dec. Dig. § 119.*]

2. CONTRACTS (§ 280*)—PERFORMANCE OF AGREEMENT TO OBTAIN REDUCTION OF TAXES.

A contract to secure a reduction in the assessment of corporate stock necessarily contemplates a reduction in the amount of the taxes erroneously assessed, or it is otherwise invalid, and hence it is not performed by obtaining a reduction, which defrauds the state of taxes to which it is entitled, and may be collected, though reduced amounts have been paid, and no proceedings are pending to correct the assessment and collect the further amount payable.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. § 1249; Dec. Dig. § 280.*]

3. APPEAL AND ERROR (§ 927*)—REVIEW—DIRECTED VERDICT.

On review of a directed verdict, the losing party is entitled to the most favorable inferences that can be drawn from the evidence, and contested facts must be deemed established in his favor.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3748, 4024: Dec. Dig. § 927.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

4. NOTICE (§ 5*)—CONSTRUCTIVE NOTICE.

Ignorance in law cannot exist when a party knowingly has at his command means of information which will dispel the same.

[Ed. Note.—For other cases, see Notice, Cent. Dig. § 3; Dec. Dig. § 5.*]

5. CONTRACTS (§ 131*) — INVALIDITY OF CONTRACT TO SECURE REDUCTION OF TAXES.

If the intention of the parties to a contract to secure a reduction of taxes is to make use of an acquaintance with public officers for the purpose of illegitimately influencing them, the contract is void.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. § 606; Dec. Dig. § 131.*]

6. CONTRACTS (§ 141*)—INVALIDITY OF CONTRACT—EVIDENCE.

Evidence held to conclusively show that a party undertook to and did secure by improper methods a reduction of taxes against corporations to which they were not entitled, and so was not entitled to compensation therefor.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. § 1785; Dec. Dig. § 141.*]

Appeal from Trial Term, New York County.

Action by David McCallum against the Corn Products Company. From a judgment for defendant, and from an order denying a new trial, plaintiff appeals. Affirmed.

Argued before PATTERSON, P. J., and INGRAHAM, McLAUGHLIN, LAUGHLIN, and SCOTT, JJ.

William King Hall, for appellant.

Harold Otis, for respondent.

McLAUGHLIN, J.   The defendant is a foreign corporation organized under the laws of the state of New Jersey. In and prior to the year 1903, a reorganization was in progress whereby the defendant, which was what is called a "holding company," was acquiring the stock of five other New Jersey corporations. According to the plan of reorganization, holders of the stock of the other companies might surrender their stock to the bankers in charge of the reorganization and receive in exchange stock of the defendant. On January 1, 1903, the defendant had acquired, owned, and then held about nine-tenths of the aggregate stock of the five subsidiary or operating companies; the other one-tenth still being held by the independent holders, and this was referred to, at least by the bankers in charge of the plan, as "outstanding stock."

The plaintiff was a salesman for one of the subsidiary companies and brings this action to recover upon an alleged contract with the defendant by which he undertook to secure for it a reduction of the amounts of the annual franchise taxes payable to the state of New Jersey by the five subsidiary companies referred to, in consideration of which defendant agreed to pay him one-half the amount of any reduction obtained for the year 1903 and one-third of such reduction and of any additional reductions for the years 1904 and 1905. The complaint alleges that through the plaintiff's efforts the amount of such taxes for the year 1903 was reduced from $11,734.34 to $3,031.85, and for the years 1904 and 1905 to $1,576.95—a reduction of $8,702.49 for

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

the year 1903, and $10,157.39 for each of the years 1904 and 1905. The judgment demanded is for one-half the former amount and one-third the amount last named for each year, with interest.

It seems that the statutes of the state of New Jersey require corporations organized in that state to file with the Secretary of State annual reports stating the amount of their capital stock issued and outstanding on the 1st of the preceding January, and the annual franchise taxes referred to are based upon a percentage of such stock. At the trial it appeared that the five subsidiary companies had duly filed such reports for the year 1903, in which the amounts of their capital stock issued and outstanding were correctly stated, and that taxes had been assessed accordingly, amounting in the aggregate, as already stated, to over $11,000. These reports were thereafter amended so as to state only the amount of the "outstanding stock"; that is, the stock not held by the defendant in this action, and the taxes were reassessed and paid, during the three years in question, upon such "outstanding stock" only, which was about one-tenth of the aggregate stock actually outstanding. At the close of the case the court directed a verdict for the defendant upon the ground that the fact was uncontradicted that the reductions had been obtained through a fraud perpetrated upon the state of New Jersey, and from the judgment entered thereon and an order denying a motion for a new trial, plaintiff appeals.

It cannot be seriously questioned that stock of any one of the five subsidiary companies held by the defendant at the time application was made for a reduction of the assessment was issued and outstanding and as much subject to a tax as was stock held by any other owner. Nor can it be seriously questioned upon the facts set out in the record that the reductions which form the basis of plaintiff's claim were secured by falsely representing to the state board of assessors of New Jersey, under whose direction the assessments were made, that the stock which was in fact held and owned by the defendant had been canceled and retired, and that the only stock issued and outstanding was that held by independent owners other than the defendant. The result of the method by which the reduction of the assessments was accomplished was unquestionably, as stated by the trial court in directing the verdict, to defraud the state of New Jersey of taxes to the amount of the reductions. It seems to me therefore that the plaintiff, even assuming that he was personally innocent in the matter, failed to establish the cause of action alleged in the complaint, and, while the defendant under such circumstances might be liable for the value of the services rendered by him, it cannot be held liable on the contract, which had not been performed. That contract must have contemplated—otherwise it was invalid—a reduction in the amount of the taxes which had been erroneously assessed. The plaintiff failed to prove there had been an erroneous assessment and that a valid reduction was obtained. It is true he did prove that the companies paid only the reduced amounts, that there were no unpaid taxes charged against any of them for the years in question, and that at the time of the trial no proceedings were pending to correct the assessments and collect any further amounts; but, upon the true facts being made to appear to the

proper authorities of the state of New Jersey, it must be assumed that that state has the power to and might at any time institute proceedings to collect the taxes out of which it has been defrauded. This is conceded by the appellant's counsel, for in his brief it is stated:

"It is true, as we now look at the result, there may be taxes due to the state; but we may safely assume that state is not without power to collect any arrears of taxes, or taxes out of which it has been cheated, from corporations of its own creation."

Upon the uncontradicted facts therefore the companies are still legally liable for the amount of the reduction obtained and full performance of the contract as alleged in the complaint was not shown, for which reason a verdict was properly directed for the defendant. Stern v. McKee, 70 App. Div. 142, 75 N. Y. Supp. 157. But I do not care, for the reasons hereinafter stated, to rest my opinion for an affirmance of this judgment upon this ground alone. A verdict having been directed for the defendant, the plaintiff is, of course, entitled to the most favorable inferences that can be drawn from the evidence, and the contested facts must be deemed established in his favor. When the evidence is thus considered, it appears that in May or June, 1903, C. L. Glass, one of the officers of the defendant, met the plaintiff in the office of the company in New York and asked him if he were a "Jersey man," and if he knew any of the people at the State House in Trenton. He answered both questions in the affirmative, and Glass then said they were paying taxes on stocks which had been canceled, which they thought was excessive. Plaintiff replied that the state of New Jersey only wanted what was right, and he would see if he could do anything, and then asked what he would get if he accomplished what was wanted. Glass, after consultation with the defendant's president, then made the promise alleged in the complaint. Plaintiff accordingly called on an ex-member of the state board of assessors of New Jersey, whom he knew, and then went to Trenton and had an interview with the secretary of the board of assessors, Maguire, who was a friend of his, and who advised him to employ counsel. Glass, being informed by the plaintiff of what Maguire had suggested, promised to pay counsel fees, and the plaintiff then engaged a New Jersey lawyer named Berdine, whom he had known some 25 years, and to whom Glass communicated the terms of his contract with plaintiff. Plaintiff and Berdine then went to Trenton, saw Maguire, and obtained printed forms to review the assessments in question, which they filled out the next day from data supplied by Glass. After the execution of these and other papers, plaintiff filed them with the board of assessors at Trenton, and Maguire told him the day when the petitions would be heard, and that he should obtain an affidavit that the amounts of stock had been correctly stated. Glass accordingly obtained from Cuyler, Morgan & Co., the bankers in charge of the reorganization, and who acted as transfer agents for the subsidiary companies whose stock was exchangeable for that of the defendant, a letter verified by a member of the firm, in which was stated, under the heading "Total Capital," the number of shares of stock of each of the companies issued and outstanding, and in a parallel column, under the heading

"Outstanding, Jan. 1/03," the number of shares "outstanding"; that is, which had not been acquired by the defendant. The plaintiff and Berdine attended the hearing at Trenton on the day set; the stock books and the canceled certificates having been sent there in charge of an employé of the bankers. At the hearing plaintiff opened the box which contained the canceled certificates and presented them to the board for inspection. The stock books, which would have shown the true state of affairs, were not produced by the plaintiff—though he knew they were there—nor were they asked for by the board. The hearing was informal, and soon after plaintiff and Berdine had retired Maguire came out of the room where the meeting was held and informed them that the petitions had been granted and the amount of the taxes reduced accordingly.

For the year 1904 the reports of two of the companies, the Glucose Sugar Refining and the National Starch, showed a further decrease in the amount of stock outstanding, and, in response to letters from Maguire asking for an explanation, plaintiff wrote two letters which he signed in the names of the officers of the respective companies "Per D. McCallum," stating that stock in such amounts was actually canceled and retired prior to January 1, 1904. Besides calling on Maguire several times and possibly filing some reports, this was all he did in connection with the taxes for 1904 and 1905. Berdine, in 1903, presented a bill for his services, which amounted to one-half of the reductions obtained for that year—something over $4,000—and the five subsidiary companies subsequently compromised and settled with him.

Concededly, if the plaintiff knew the true facts and endeavored to have the taxes reduced when it could not lawfully be accomplished, he could not recover; but it is claimed he acted in good faith and supposed, as he was told by Glass, that the stock had been actually canceled and retired, and for that reason he is entitled to enforce his contract. The position in which the plaintiff is placed by the conceded facts, as well as the claim made by him predicated thereon, is a peculiar one. The action is to recover upon a contract to secure a reduction of °taxes, which he claims to have performed, and which performance was accomplished by means of the grossest misrepresentation, fraud, and perjury. Yet he claims to have been entirely ignorant of the methods used. He admitted knowing the defendant was a holding company, but claimed to know nothing as to the condition of its stock and that of the subsidiary companies, on the basis of which the reductions were secured. He could not state by what means he supposed the reductions were lawfully secured, nor why the defendant should have been interested in having the taxes of the other companies reduced if the stock which it held had been canceled. I think it must be held that the plaintiff had at least constructive knowledge of the means by which the reductions were obtained. Ignorance in law cannot exist when a party knowingly has at his command knowledge which will dispel the same. The letter from Cuyler, Morgan & Co., setting forth the number of shares "outstanding," could not have been misunderstood by him. It correctly stated, under the heading "Total Capital," the number of shares issued and outstanding, and it must be assumed that the

plaintiff had ordinary intelligence, and, if so, he could not have been mistaken in the meaning of these figures. The claim that the plaintiff supposed the numbers stated in this letter represented the authorized capital is overcome by the fact that the authorized capital was correctly stated in the petitions filed by him. Not only this, but in this letter the "total capital" of one of the companies was 50,500 shares, which was the amount stated in the report filed for 1903, upon which a tax of $50.50 had been assessed, and the "outstanding stock" was stated to be "none." Yet in the petition to review the assessment, the stock issued and outstanding was given as 500, and the assessment was accordingly reduced to 50 cents.

In this connection, and as bearing upon the same subject, it is highly significant and of the utmost importance, that the plaintiff submitted to the board of assessors at Trenton only the canceled certificates, which were, of course, no proof that stock to that amount had been retired, and that no other certificates had been issued to take their place. The transfer books showing the true condition of affairs were there. He knew it, and it is difficult to imagine that he was entirely ignorant of their contents. If he was, it was his own fault. The information was placed at his disposal, and under such circumstances he had no right to rely solely upon the statements made by Glass. He could not suppress the evidence which he had in his possession, which showed that the companies were not entitled to the reductions asked for, or shut his eyes to the fact that he was participating in a fraud. He was, as already said, a salesman of one of the subsidiary companies earning about $1,400 a year. He was not a lawyer, had never had any experience whatever in looking after the taxes of corporations, nor did he claim to have any knowledge of the tax laws of New Jersey, or the method by which an erroneous tax could be legitimately corrected. He did not have sufficient knowledge upon that subject to fill out an ordinary blank furnished by the board of assessors for that purpose. It is difficult to see what he did, or what he supposed he was to do, to earn such a large compensation. Then, too, the terms of the contract itself are suspicious. If taxes had been erroneously assessed for the year 1903, there is no reason suggested why it should be supposed there would be an erroneous assessment in subsequent years, and, if not, then there would be no occasion for paying plaintiff any part of the amount saved in those years.

Take the plaintiff's own testimony, and give him the benefit of every inference that can fairly be drawn from it, and you have this situation presented: He was engaged primarily, not because he had any knowledge which would enable him to legitimately or legally obtain a reduction of the taxes assessed, but simply because he was a "Jersey man" and knew some of the officials at Trenton. A lawyer was employed and paid for doing the legal part of the work. Aside from the mere clerical services, then, which would not by any means warrant the compensation agreed to be paid, there was nothing for the plaintiff to do, unless it were to improperly make use of his acquaintance with public officers for the purpose of illegitimately influencing them. If this was the intention of the parties, the contract was void. Mills

v. Mills, 40 N. Y. 543, 100 Am. Dec. 535; Veazey v. Allen, 173 N. Y. 359, 66 N. E. 103, 62 L. R. A. 362; Hazleton v. Sheckels, 202 U. S. 71, 26 Sup. Ct. 567, 50 L. Ed. 939. The conclusion is irresistible that the plaintiff undertook to and did secure a reduction by methods which the court does not and will not sanction or approve.

Entertaining these views, I am of the opinion that the court properly directed a verdict for the defendant.

The judgment and order appealed from therefore should be affirmed, with costs.

INGRAHAM, LAUGHLIN, and SCOTT, JJ., concur. PATTERSON, P. J., concurs in result.