STANDISH CHARD, as Receiver for CORNELIUS J. SULLIVAN, Respondent, v. RYAN-PARKER CONSTRUCTION COMPANY, Appellant.

First Department, March 8, 1918.

Corporation — agreement of president to pay one-half of profits on public contract — ratification question for jury — acceptance of services claimed to have been rendered under contract may justify a finding of ratification — court will ascertain intention of partner — when illegality of contract need not be pleaded — erroneous charge.

The president of a construction company unless specially authorized by its board of directors cannot bind it by a contract to pay to one engaged in the life insurance business one-half of its profits on a $6,000,000 contract for the building of a bridge for a city for services neither specified nor described.

Where one-fourth of the stock of the corporation was owned by a syndicate which held the balance of the stock as security for the repayment of certain loans, the corporation is in no sense a " one man corporation "

which the owner of the stock, held as security, could bind by an informal contract, and the question as to whether such a contract had been ratified by the corporation was properly submitted to the jury.

While there was no evidence that such contract was ratified by defendant or its directors at any time when the syndicate was interested in the defendant, as it did appear that, after the syndicate had disposed of its stock to one who conducted the affairs of the defendant with dummy directors as though it was his own personal business, the plaintiff rendered some services to the defendant with full knowledge on its part that plaintiff was claiming under the contract, the acceptance of such services was sufficient to justify a finding that the contract had been ratified.

While the contract, because of indefiniteness, was not enforcible as an executory contract, yet having been executed by the rendition and acceptance of plaintiff's services, it was binding.

While the contract in spite of the fact that plaintiff's compensation was contingent upon the event of defendant's being awarded the contract to construct the bridge, was not on its face void as against public policy, the court will look into the surrounding circumstances and ascertain what was in fact the purpose and intention of the parties without being concluded by the phraseology of the contract or by proof of what was actually done under it.

While the law will not aid in the enforcement of an executory contract which tends directly to corrupt action or secret or improper resort to public officials, yet in the absence of proof that such was the intention of the parties, a recovery for compensation for legitimate services actually rendered under the contract may be sustained; but where the evidence warrants a finding that the purpose and intention of the contract, entirely innocent upon its face, was to influence official action by improper means, independent of the merits, no recovery can be had for such services.

Upon examination of the evidence which was conflicting, *held*, that it was a question for the jury as to whether the contract was made with intent to influence the action of public officials.

As the welfare of the public is involved, it was not essential that the illegality of the contract should be pleaded, and an instruction to the jury that there was no evidence to justify a finding that there was any other consideration for the contract than what the law terms legal, was erroneous, as was also a refusal to submit to the jury the question whether the contract was made to obtain the political services and influence of a certain public official in securing the award of the contract to the defendant.

DOWLING, J., dissented.

APPEAL by the defendant, Ryan-Parker Construction Company, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of New York on the 19th day of January, 1916, upon the verdict

of a jury, and also from an order entered in said clerk's office on the 7th day of February, 1916, denying defendant's motion for a new trial made upon the minutes.

*Martin Conboy* of counsel [*Henry T. Hall* with him on the brief; *John C. Wait,* attorney], for the appellant.

*Alfred G. Reeves* of counsel [*Max D. Steuer* and *Julian C. Harrison* with him on the brief; *Reeves & Todd,* attorneys], for the respondent.

SHEARN, J.:

The respondent, as receiver in supplementary proceedings of Cornelius J. Sullivan, has recovered a judgment against the defendant for $383,079.67, entered on the verdict of a jury. The claim is based upon an instrument in writing, dated May 3, 1906, between Sullivan and the defendant, reciting and providing:

" That the said Cornelius J. Sullivan has heretofore rendered service to the said Ryan-Parker Construction Company, and by the covenants and agreements of this contract, promises to render services in the future, and in consideration of such service rendered and to be rendered the said Ryan-Parker Construction Company covenants and agrees as follows:

" That if and in the event the contract for the construction of the Manhattan Bridge over the East River between the Boroughs of Manhattan and Brooklyn shall be awarded to the said Ryan-Parker Construction Company, for which contract the said Ryan-Parker Construction Company has submitted its bid, estimate, bonds, contract and specifications, the said Ryan-Parker Construction Company covenants and agrees to give and secure to the said Cornelius J. Sullivan one-half of the net profits which the said Ryan-Parker Construction Company shall receive under and by virtue of the execution and full performance of the said contract for the construction of said bridge between the City of New York and the said Ryan-Parker Construction Company.   *   *   * That for and in consideration of the covenants and agreements hereinbefore expressed, the said Cornelius J. Sullivan hereby agrees and covenants to render to the said Ryan-Parker Construction Company such service or services as

may be required of him by the said Ryan-Parker Construction Company in a managing or advisory capacity.

"*In witness whereof*, the party of the first part has caused its corporate name to be hereunto subscribed by its President, and its corporate seal to be hereunto affixed and the party of the second part has subscribed and sealed this agreement.

"RYAN & PARKER CONSTRUCTION CO.,

"By P. RYAN, *President*.

"[SEAL]

"CORNELIUS J. SULLIVAN.  [SEAL]."

Cornelius J. Sullivan, who will be referred to as the plaintiff, was engaged in the life insurance business as his regular employment. From time to time he had other activities. He was connected with the Sullivan Advertising Company, had been interested in the promotion of a patented preparation called "Bromonia," and had had a contract with the Monorail Company "for the purpose of furthering the interests of the corporation in regard to their affairs" and "if there was any public letting of work to be done, to see if we couldn't get their system adopted, especially for the — the particular subject was that they were trying to get a franchise to run a spur track on 42nd Street." Plaintiff was not an engineer and had never had anything to do with bridge construction. He was not a lawyer and had never studied law. He was a second cousin of Timothy D. Sullivan, who had been a State Senator and was at the time involved, according to the testimony, a member of Congress and regarded as a man of influence and prominence in politics in the city of New York. The plaintiff and Timothy D. Sullivan had certain interests in common and for several years preceding 1906 it had been their custom to meet at the rooms of the Timothy D. Sullivan Association practically every day when they were in the city.

The defendant corporation represented and practically handled and carried on the contracting business of the firm of Ryan & Parker, and previous to the Manhattan bridge project had carried out contracts for important public improvements, such as the Riverside Drive viaduct and foundations for the Blackwell's Island bridge.

At the outset, attention is arrested by the extraordinary character of this contract, whereby for services not specified

or described, a business corporation agreed to pay a man engaged in the life insurance business one-half of its profits in building a bridge for the city at a contract price, as the evidence shows, of $6,483,223.

Plaintiff's claim is substantially this: That in 1905 the city of New York received bids for the construction of the Manhattan bridge, and the lowest bid was for $7,284,739; that this amount was apparently the result of an agreement among the bidders and the courts enjoined the letting of the contract at that price, and the matter was thrown open for new bids; that plaintiff, believing that the other bidders were still in an agreement to keep the price high, conceived the idea of putting in a bid which would result in a substantial profit and yet be sufficiently low to make probable the obtaining of the contract; that he revealed this plan to Patrick F. Ryan, defendant's president, and worked with him in elaborating the project and determining the figures. He testified that, by studying the schedules employed on the previous bidding and considering the estimates made by Ryan and by LaChicotte, defendant's engineer, he was enabled to advise the defendant to put in a bid of $6,493,000, and that substantially this bid was put in by the defendant on April 30, 1906, and the contract awarded to defendant. Plaintiff does not explain how he was able to make up a bid that would cover cost and profit without any knowledge or experience whatever in bridge or other construction. It may also be noted here in passing that LaChicotte recovered and collected a judgment for some $40,000 for bringing this matter to the attention of the defendant and preparing the bid. Plaintiff further claims that thereafter he conducted negotiations for materials, dealt with a surety company and the comptroller regarding a bond, interviewed various concerns at the request of Ryan and reported to him the results of the interviews, negotiated with the Phœnix Bridge Company, to which the contract for structural steel was finally given, and had to do with the contract with the Carbon Steel Company for cables and with Terry & Tench for construction work; and that for several months he devoted practically all of his time in endeavoring to forward the project and carried out every instruction given to him.

First Department, March, 1918.    [Vol. 182.

The defendant, denying that plaintiff ever rendered it any services of any value whatever, contends that the agreement sued upon, executed by its president Ryan, was unauthorized and never ratified, that it is too indefinite to be enforcible, and that the intention and purpose of the agreement was to procure political influence to obtain the award of the bridge contract, and once obtained, to render it secure against attack, and, therefore, that it is void as against public policy.

That the president of the defendant would have to be expressly authorized to bind the defendant to a contract of this extraordinary character is obvious. Plaintiff relies in the first instance upon the presumption arising from the fact that the corporate seal of the defendant was affixed to the instrument. (*Quackenboss* v. *Globe & R. F. Ins. Co.*, 177 N. Y. 71.) The defendant meets the presumption by showing that the contract never was authorized by the board of directors. Plaintiff rejoins by claiming that the defendant was virtually a " one-man corporation and that Ryan was the corporation," and relies upon cases holding that when a corporation consists of a small number of persons they may effectually transact their business in a very informal manner. (*Barkin Construction Co.* v. *Goodman*, 221 N. Y. 156.) But the evidence shows that at the time this contract was made, an Ohio syndicate, consisting of three persons, had a substantial interest in the company and virtually controlled it. These parties owned more than one-fourth of the stock and held all of the balance of the stock as security for the repayment of loans of between $200,000 and $300,000 which they had advanced as working capital for the firm of Ryan & Parker. They were represented in the directorate of the defendant, and the evidence shows that up to the time of this contract the board of directors was in frequent session and passed upon important matters. So that it cannot be successfully claimed that when this agreement was made the defendant was in any sense a " one-man corporation." There remains, however, before the contract can be disposed of as unauthorized, the question whether it was not ratified by the defendant. This question was submitted to the jury, and properly so. While there was no evidence that it was ratified by the defendant or its directors at any time when the Ohio syndicate were

interested in the defendant (for they knew nothing about the contract and could not ratify it without knowledge), it appears that the Ohio syndicate on June 5, 1906, disposed of their interest in the defendant to Ryan and that thereafter Ryan conducted the affairs of the defendant with dummy directors and as though it was his own personal business. Subsequent to this, according to the contention of the plaintiff and as found by the jury, the plaintiff rendered some services to the defendant with full knowledge on the part of the defendant that he was claiming under his contract. The acceptance of such services under these circumstances was sufficient evidence to warrant the jury in finding that the defendant had ratified the contract.

The claim of indefiniteness urged against the contract would be valid if the contract were an executory one. It is quite conceivable that, under some circumstances, a contract calling for the employment of one to render services " in a managing or advisory capacity " would be upheld as sufficiently definite, as in the case of an ordinary employment contract. Not so, however, in the case of such an extraordinary contract as this, where a corporation agrees, instead of paying dividends to its stockholders, to divide its profits, running into hundreds of thousands of dollars, with one who agrees to render no specified services whatever. But the difficulty with defendant's position is that the contract has been executed, assuming that the plaintiff did, as the jury found, render some services and all that he was called upon to render, and assuming further that the contract contemplated such services and not the sale of political influence. If one performs services under a contract, no matter how general and vague the description of the services to be rendered may be in the contract, it is certainly no defense on the part of another who has accepted the services to say that the agreed compensation shall not be paid because the services were not sufficiently pointed out or described in the contract. Furthermore, the contract was before this court on an application to inspect the defendant's books and also on an application to examine the defendant before trial (*Sullivan* v. *Ryan-Parker Const. Co., No. 1,* 148 App. Div. 243) and plaintiff's right to both was upheld. While the parties did not raise the question,

this court would hardly have granted the relief sought in an action upon a contract that was, as it is now contended to be, invalid and unenforcible on a mere inspection thereof. Inferentially at least, those decisions upheld the validity of the contract so far as concerns the claim of indefiniteness.

Finally, it is claimed that the contract is void as against public policy, and that, in any event, the court should have submitted to the jury the question whether its intent and purpose was the sale and purchase of political influence to be exerted in securing the contract and in connection therewith. Manifestly the contract is not a corrupt or illegal one upon its face, in spite of the fact that the compensation is contingent upon the event of defendant being awarded the contract to construct the bridge. This contract was drawn by a skilled lawyer. Moreover, contracts for the sale of political influence are not apt so to provide in terms or to express any intent or obligation to employ corruption or improper recourse to public officials. But the court is not concluded by the mere phraseology employed. In such a case as this, where the contract contemplates official action as a condition precedent for the payment of compensation, and where such a huge sum is to be paid for " services " unspecified and so vaguely and generally referred to, the court will look into the surrounding circumstances, consider the situation of the parties, their negotiations and the subject-matter of the agreement, and ascertain what was in fact the purpose and intention of the agreement, without being concluded by its phraseology or by proof of what was actually done under it. In a matter so vitally affecting public policy, the court could do no less.

In the Federal courts it is well settled that the law will not lend its aid to enforce a contract which tends to corrupt or contaminate, by improper influence, the integrity of our social or political institutions; also that the decision does not turn upon the question whether improper influences were contemplated or used, but upon the corrupting tendency of the agreements. (*Marshall* v. *Baltimore & Ohio R. R. Co.,* 57 U. S. [16 How.] 334; *Tool Co.* v. *Norris,* 69 id. [2 Wall.] 45, 54, 55.) This rule, making the corrupting *tendency* of the agreement the test of invalidity, was followed in *Mills* v. *Mills*

(40 N. Y. 543), where the action was brought to enforce specific performance of a contract to convey land, the consideration for which was the plaintiff's agreement to give all the aid in his power, and to use his utmost influence and exertions to procure the passage of a law granting to the defendant and others the right to build and operate a railroad. In holding the contract void the Court of Appeals said: "It is not necessary to adjudge that the parties stipulated for corrupt action, or that they intended that secret and improper resorts should be had. It is enough that the contract tends directly to those results. It furnishes a temptation to the plaintiff, to resort to corrupt means or improper devices, to influence legislative action."

In *Chesebrough* v. *Conover* (140 N. Y. 382) the question submitted was whether or not it was part of the contract there involved that the plaintiff should have private and personal interviews with members of the Legislature. The contract was an oral one, so that the question was not what the contract implied, but what it was. The court held that there was evidence upon which the jury might find for the plaintiff, saying: "Here the jury could find that the plaintiff was not employed to render, and that he did not render, lobby services. He was not a lobbyist, and he had no acquaintance or influence with any member of the Legislature, and it does not appear that he had any peculiar facilities for procuring legislation. The jury could find from the evidence that he was employed by the defendant to draw legislative bills and to explain them to members of the Legislature, and to procure their introduction into the Legislature, and nothing more. It does not appear that he asked or solicited any member of the Legislature to vote for the bills, or that he did anything except to explain them, and request their introduction; and so much he could do without violating any public policy. It must be the right of every citizen who is interested in any proposed legislation to employ an agent for compensation payable to him, to draft his bill and explain it to any committee or to any member of a committee, or of the Legislature, fairly and openly, and ask to have it introduced; and contracts which do not provide for more, and services which do not go farther, in our judgment, violate no principle of law or rule

of public policy." It has been thought that the *Chesebrough* case relaxes the rule laid down in the *Mills* case.

*Veazey* v. *Allen* (173 N. Y. 359) was an action upon a contract for the proceeds of a speculation in the stock of the Distilling and Cattle Feeding Company and the American Sugar Refining Company. The fall in the price of the shares which was the immediate cause of the profits was the result of a congressional investigation into the affairs of both companies, which investigation was instigated by the plaintiff. It was not a contract which contemplated a single illegal act. This fact was recognized by the court. It could only be held invalid, and it was in fact so held, merely because of its corrupting tendency. The court said: " In its final effect we have here a case in which it is alleged and proved that the consideration of the contract sought to be enforced is the fruit of a legislative investigation, instituted, prosecuted and encouraged by the plaintiff. That such a contract is one which, in its object, operation and tendency, is calculated to be prejudicial to the public welfare, ought not to be doubted for a moment. Why? Not because the plaintiff was in fact necessarily dishonest or corrupt in instituting and prosecuting the investigation; nor yet because the charges preferred against the offending corporation were not true, but because the plaintiff voluntarily acquired a pecuniary interest in the result of the investigation, which might subject not only him, but through him others, to the temptations and allurements which human experience has proven to be potent in sacrificing sound morality and honesty to that greed and cupidity which not infrequently beget perjury, bribery and other moral delinquency, incompatible with the public weal."

*Dunham* v. *Hastings Pavement Co.* was four times before this court (56 App. Div. 244; 57 id. 426; 95 id. 360; 118 id. 127). It was founded upon a contract which bound the plaintiff to " use and make all reasonable, honest and lawful efforts to secure the right from the city of New York to make bids for laying such pavement or paving blocks upon the streets of the city of New York." The last appeal was upon demurrer to the amended complaint, and the defendant appellant based its case upon the then recently decided case of *Veazey* v. *Allen* (*supra*). The court said: " The views expressed in

the opinion in *Veazey* v. *Allen* (*supra*), which in this regard were not essential to the decision, incline toward the doctrine subsequently announced by the Supreme Court of the United States in *Hazelton* v. *Sheckells* [202 U. S. 71], that the validity of a contract with respect to services concerning legislation or the action of public bodies or officials in awarding contracts is to be determined not by what is expressly contracted to be done, but upon what may be done thereunder and the tendency of the agreement, where the compensation is contingent upon success, to induce improper solicitation or the unlawful and corrupt use of money. * * * Under the broad doctrine announced in *Hazelton* v. *Sheckells* (*supra*) it is clear that this contract could not be enforced. However, whether the contract be void upon grounds of public policy is not a Federal question, but one for the exclusive jurisdiction of our own courts. The majority of the court, as now constituted, would favor the adoption by the State courts of the doctrine enunciated in *Hazelton* v. *Sheckells* (*supra*), but since it apparently goes beyond any doctrine enunciated by the Court of Appeals and essential to the decision of the case before the court, and since the former decisions of this court under which this litigation has been continued, were based upon a former decision of the Court of Appeals, we think it should be left to that court to decide whether it was intended by the *Veazey* case, or is now the judgment of that court, that the doctrine of *Hazelton* v. *Sheckells* (*supra*) should be fully adopted in this State."

Mr. Justice SCOTT in his dissenting opinion said: " Since the first appeal the Court of Appeals in *Veazey* v. *Allen* (173 N. Y. 359) have expressly reaffirmed the rule of *Mills* v. *Mills* in all its stringency, and have again held that the test to be applied to what is claimed to be a lobbying contract, is not that the parties actually stipulated for corrupt action, or intended that secret and improper resorts should be made, but that it is enough to condemn such a contract that it *tends* directly to these results, and furnishes a temptation to plaintiff to resort to corrupt means or improper devices to influence legislative action." The decision of this court was affirmed (189 N. Y. 500).

In *McCallum* v. *Corn Products Co.* (131 App. Div. 617), in which the plaintiff sued for compensation for services in procuring the reduction of taxes for the defendant, the court said: " Take the plaintiff's own testimony, and give him the benefit of every inference that can fairly be drawn from it, and you have this situation presented — he was engaged primarily, not because he had any knowledge which would enable him to legitimately or legally obtain a reduction of the taxes assessed, but simply because he was a ' Jersey man ' and knew some of the officials at Trenton. A lawyer was employed and paid for doing the legal part of the work. Aside from mere clerical services, then, which would not by any means warrant the compensation agreed to be paid, there was nothing for the plaintiff to do unless it were to improperly make use of his acquaintance with public officers for the purpose of illegitimately influencing them. If this was the intention of the parties the contract was void. (*Mills* v. *Mills,* 40 N. Y. 543; *Veazey* v. *Allen,* 173 id. 359; *Hazelton* v. *Sheckells,* 202 U. S. 71.) The conclusion is irresistible that the plaintiff undertook to and did secure a reduction by methods which the court does not and will not sanction or approve."

It appears from this review of the cases that the law as now interpreted and applied may be stated as follows: In the case of an executory contract, the law will not aid in its enforcement where the contract tends directly to corrupt action or secret and improper resort to public officials. In an action to recover compensation for legitimate services actually rendered under a contract which tends to corrupt action or to secret and improper resort to public officials, in the absence of any proof that such was the intention and purpose of the contract, a recovery may be sustained. Where, however, there is evidence warranting a finding that the purpose and intention of the contract, entirely innocent upon its face, was to influence official action by means of political considerations, or other improper means independent of the merits, the law will not aid a recovery even though the services actually rendered were legitimate.

Concerning the purpose and intent of this contract, the evidence presents a sharp conflict. The claim of the plain-

tiff has been pointed out. Ryan's testimony, however, if true, clearly supports the inference that the contract contemplated obtaining the political influence of Timothy D. Sullivan to assist the defendant in getting the bridge contract and carrying it out without undue molestation. Ryan testified that, about ten days or two weeks before the bids were opened and the contract let, he had a conversation with the plaintiff and told him that he wanted to see Timothy D. Sullivan; that plaintiff said he would make an appointment and did so; that in company with the plaintiff he met Timothy D. Sullivan at the clubhouse of the Sullivan Association on Sunday of the week preceding the letting. Ryan testified, in substance, that he told Timothy D. Sullivan that he was there " on a proposition about the Manhattan Bridge, that it was going to be relet; " that he " had figures made on the cost of doing the work, and found out there was going to be a big profit in it, if it could be got at the prices that had been previously bid, or near the prices; that this combination of bridge companies were in cahoots with each other, backed up by pretty strong political backing; " that he " wanted to bid on this bridge, and wanted to have equally as strong backing as they had; that this Pennsylvania Steel Company had had a politician of a good deal of note on their staff, and that I thought I would like to have as big a one or bigger, and I came to him with the proposition that he would furnish me a bond of private sureties in the sum of a million and a half that was required, and a seventy-five thousand dollar check, I would put in a bid, and if I won the contract I would split the profits with him." Ryan testified that Timothy D. Sullivan said that he had passed the resolution in the Senate " making it possible to do this bridge, and that he had never gotten anything out of the bridge companies, and it was an opportunity that he would like to take advantage of; that he could furnish the bond and a seventy-five thousand dollar certified check." Ryan further testified: " So he turned to C. J. Sullivan, who was with us, and told him to fix up the bond, that he could get either Harry Payne Whitney or Morgan — or the Guggenheims; even Morgan, he could get J. Pierpont Morgan, if it was necessary; that he had all the influence and all the backing that I required, and he would be

glad to join with me in pulling off this trick. * * * And he turned me over to Mr. C. J. Sullivan to go on and perfect the arrangements, and we would make the bid." According to Ryan, plaintiff came to him the following day and asked for Ryan's figures and estimate for building the bridge, saying that Timothy D. Sullivan was going to Pittsburg and wished to show them to an engineer and that he gave him a sheet of figures on his promise to keep it secret. Two or three days passed and nothing was done toward furnishing Ryan with a bond or check. Plaintiff informed Ryan that Timothy D. Sullivan had gone to Hot Springs and that he, the plaintiff, was helpless and could not get the $75,000 check or the bond. Ryan arranged for the check at the Oriental Bank and the bid was put in. Two employees of Ryan went on the bond. A further detail of this unsavory matter is that Ryan's lawyer turned over to these straw bondsmen a quantity of gold mining stock, which the lawyer held as trustee, in order to " qualify " the bondsmen and enable them to make oath that they were worth $3,000,000. Ryan knew that the bond would be attacked by other bidders and that it would not stand investigation. He testified that on the third of May plaintiff came to him and told him " that if we had some written agreement when the big fellow got back, to show that he was interested he could procure the bond," and that plaintiff took him down to a lawyer's office, where the agreement in suit was prepared. Ryan testified that the lawyer said: " Why, you can't make any bond of that character; you can't make a bond with a politician that would be worth the paper it was written on. This is against public policy, and you can't make any contract or agreement of any kind in writing, that is worth the paper it is written on; " that plaintiff said: " I am lawyer enough to know that; I studied law, and I know it; but I have got to have * * * something to show the Sullivans we are interested." Ryan replied, according to his testimony, " Well, it is Tim Sullivan that is going to do the work for me. I have got to have his influence in case I am low, that I won't be beaten out of the contract by the influence of the Pennsylvania Steel Company if they should be next to me, and I have got to have these bonds; " that the lawyer then drew up the agreement, again warning them that the contract

would not be binding but that they would have to depend on one another's word; that " this is a political contract, a job where you are looking for political influence." Under these circumstances, according to Ryan's testimony, the contract was executed. Plaintiff did not procure the bond or a check for $75,000, and Ryan made other arrangements for same.

It should be stated here that plaintiff flatly contradicts Ryan's testimony, and that Ryan did not give this testimony upon a former trial of this action when Timothy D. Sullivan, who has since died, was alive and able to defend himself. While this goes strongly to the worth of Ryan's testimony, it does not alter its legal effect.

There are several items of evidence which a jury might find to be corroborative of Ryan's claim that he was purchasing political influence. Plaintiff himself testified that he brought Ryan to Timothy D. Sullivan after the bid was put in and the contract in suit drawn, but before the contract in suit was executed, and that the following conversation took place: " I said to Senator Sullivan: ' Senator, this is Mr. Ryan,' or ' Shake hands with Mr. Ryan; he is a gentleman that I am interested with in this bid on this contract, and he wanted me to ask him some questions, how far you will go for me, or something to that effect. Now, I have brought him here so that he can ask you anything that he pleases, so that you can meet, and if he has anything to say, to say it.' And that is all there was to it. So Ryan said to him, ' Senator, how far will you go for Con?' And the Senator looked him in the eye, and said, ' Mr. Ryan, I will go as far as I can. Is that satisfactory?' He said, ' That is satisfactory to me.' And that was absolutely the only thing that was said."

Given the surrounding circumstances, the situation and the relation of the parties, it requires no extended discussion to show that the jury might have inferred that this was a plain promise on the part of Timothy D. Sullivan to put all of his political influence and backing behind the project in which the plaintiff was, according to his claim, interested. Further, the lawyer who drew the contract in suit for the plaintiff was called as a witness by the defendant in respect to the circumstances attending the drawing of the contract and testified: " My recollection of the matter, the substance

First Department, March, 1918.    [Vol. 182.

of it is this: that I spoke about the fact that the services to be rendered by Mr. Sullivan were not specified in the agreement, and that the services which he was to render were not specified to me. Q. Did you make any comment upon it? A. I have an indistinct recollection, Mr. Conboy, that I said, ' This contract may not be enforceable, because it may come in the class of lobby contracts.' " The lawyer was not cross-examined, but his testimony was contradicted by the plaintiff.

Another item is the situation of the defendant at the time the contract was made. Ryan knew that he had put up a straw bond, and that a thorough investigation of the matter by the board of estimate and apportionment would lose the defendant the contract, even if its bid were the lowest. He anticipated an attack upon his bid from the other bidders, one of whom, according to his testimony, had an influential politican " on their staff." While no court would assume that the public officials, in deciding on the award, would be influenced by any consideration except the merits, and there is nothing to show that they were actuated by. any other consideration, it does not follow that these contractors and bidders did not believe, and act upon the belief, that their position would be strengthened with the public officials, or with some of them, if they had political influence and backing. Taking into consideration all of these matters, and adding the vagueness of the services as stated in the contract, the fact that plaintiff's compensation depended in the first instance upon the contract being awarded, the fact that plaintiff was not in any respect connected with the bridge building business, but was in the business of life insurance and advertising, and the very large sum claimed for such services as were rendered, a question of fact for the jury was presented by the conflicting testimony and the conflicting inferences to be drawn as to the real purpose and intention of this very extraordinary contract.

It is insisted by the respondent that the issue of the illegality of the contract was not presented for determination owing to the failure of the defendant to plead illegality. The defendant did plead in the fifth defense that the plaintiff represented that he " had powerful affiliations which were influential with the government of the City of New York and certain persons hold-

ing important offices therein, which influence would be helpful to the defendant in obtaining the contract for said bridge; " but this allegation was made to show fraud.   Notwithstanding the decision in *Milbank* v. *Jones* (127 N. Y. 370) it is now held that where the general public is affected by a violation of law, it is not essential that the illegality be pleaded.   In *Drake* v. *Lauer* (93 App. Div. 86, 88; affd., 182 N. Y. 533) the court said: " It is urged upon appeal that the objection that the contract was void as against public policy was not raised by the pleadings, and could not be considered.   We think the better rule is laid down in *Dunham* v. *Hastings Pavement Co.* (56 App. Div. 244), namely, ' Where the statute is provided for the protection of parties, and the benefit taken thereby may be waived, the defense of invalidity must be pleaded or the defendant cannot avail himself of it.   *   *   * The rule is otherwise, however, where the general public is affected by the violation of the particular statute, or the provisions of any public law; in such case the enforcement of rights arising thereunder is or may be opposed to good morals or a sound public policy, and courts will refuse their aid to parties so contracting, and will in every instance leave them as it found them.   In such a case it is not necessarily essential that the illegality be pleaded.   Courts of their own motion will interfere and deny the right to any relief thereunder without reference to the state of the pleadings.' "

This extract from the *Dunham* case has been cited with approval in the two recent cases of *Barry* v. *Mulhall* (162 App. Div. 749) and *Sprague* v. *Webb* (168 id. 292).   An attempt is made to distinguish these cases by asserting that the evidence of illegality in those cases appeared from the evidence offered in support of the plaintiff's case, or that the contracts were invalid on their face.   It is to be noted, however, that in the *Drake Case* (*supra*) the dissenting opinion raised the point that it did not appear upon the face of the complaint or necessarily from the evidence given on behalf of the plaintiff that the contract was illegal, but nevertheless the judgment was affirmed.   Furthermore, in the case at bar, the inference that the purpose of this contract was illegal might be drawn from the evidence introduced in support of the plaintiff's case.

The learned trial justice, therefore, erred in instructing the jury "that there is no evidence before you whatever to justify a finding that * * * the testimony adduced shows that there was any other consideration for this contract than what the law terms legal," and in refusing to submit to the jury the question whether the agreement was made to obtain the political services and influence of Timothy D. Sullivan in securing the award of the bridge contract.

The judgment and order must, therefore, be reversed and a new trial ordered, with costs to appellant to abide the event.

CLARKE, P. J., LAUGHLIN and PAGE, JJ., concurred; DOWLING, J., dissented.

Judgment and order reversed, new trial ordered, costs to appellant to abide event.