WILLARD E. NOYES, Respondent, *v.* IRVING TRUST COMPANY, as Trustee in Bankruptcy of McLELLAN STORES COMPANY, Appellant.

First Department, March 12, 1937.

*Inzer B. Wyatt* of counsel [*Proskauer, Rose & Paskus*, attorneys], for the appellant.

*Simon Goldman* of counsel [*Herbert Brody*, attorney], for the respondent.

O'MALLEY, J. The judgment appealed from imposes liability upon the defendant trustee in bankruptcy of the McLellan Stores Company in the sum of $5,897.29, claimed by the plaintiff, an employee of the bankrupt (continued in the employ of the trustee),

to be due him as a bonus. He asserts that under his contract of employment with the bankrupt he was entitled, in addition to a salary of $400 a month, to a bonus based upon a percentage of profits, and that the defendant trustee assumed this obligation.

The appeal of the defendant trustee is predicated upon the ground that it was entitled to a dismissal of the complaint as a matter of law for the reasons (1) the bankrupt itself was never obligated to pay the bonus; and (2), assuming the bankrupt to have been so obligated, the defendant trustee did not assume the obligation.

Plaintiff entered the employ of the bankrupt as a buyer of merchandise on August 1, 1932. He was engaged by Fred F. Taylor, merchandise manager, with whom he had been at one time associated in the employ of the W. T. Grant Stores. Concededly Taylor, to induce plaintiff to leave a position which he then had with the Grant Stores at New Bedford, Mass., told him that in addition to his regular compensation of $400 a month he would share in a bonus plan similar to that maintained by the Grant Stores, on the basis of twelve and one-half per cent of the operating earnings of the company, to be divided among executives, department heads and buyers, in proportion to their salaries.

Plaintiff's testimony was supported by that of Taylor, who testified that, before engaging him, he discussed the matter of his employment with Powdrell, president of the bankrupt; that Powdrell told him that plaintiff would share in a bonus plan which was to be submitted by him to the board of directors for approval; that later, and before he employed the plaintiff, Powdrell told him that the plan had been adopted and that he, Taylor, so informed plaintiff when he engaged him.

McLellan Stores went into bankruptcy on January 12, 1933, the defendant being appointed receiver. In the meantime plaintiff had received his regular salary of $400 a month without bonus. On January 26, 1933, the defendant was appointed trustee, and thereafter operated the business of the bankrupt for the period embraced within the complaint.

The plaintiff continued in the defendant's employ until February 21, 1935, when he was discharged. He was paid salary up to March 31, 1935. During all of this time plaintiff was paid only his regular salary, with the exception that he received $250 on December 29, 1933. This payment, as claimed by the defendant, was a Christmas present, other employees having received similar gifts at the same time. None of such payments was shown to have been based upon a percentage of profits.

Moreover, it appears that plaintiff at no time during his employment either by the bankrupt or by the defendant, demanded or

made claim for any bonus. His first complaint with respect thereto was contained in his letter of March 27, 1935, written after his discharge, to the defendant trustee.

Before considering the question of whether the plaintiff was entitled to a bonus under his contract with the bankrupt, the evidence upon which he predicates his right to recover from the defendant trustee will be considered. It appears that in February, 1933, after the trustee had been operating the business for a period of three or four weeks, one Simpson (a representative of the trustee, deceased at the time of the trial) called together the buyers and executives, numbering some fifteen or twenty persons, and, according to the plaintiff, Simpson stated: " He told us that we were to know that we were now employees of the Irving Trust Company. In other words, there was to be no change at all in our standing or in the set-up. We were to go right on in our work just exactly as we were doing it for the McLellan Stores Company. The only difference was we were now employed by the Irving Trust Company instead of the McLellan Stores Company."

There seems to be no dispute but that this alleged statement of Simpson is the sole basis of the plaintiff's claim that the defendant bound itself to pay the bonus, if any, which the plaintiff was entitled to receive from the bankrupt. It is to be noted that the subject of bonus was not mentioned, nor is there any evidence tending to show that Simpson or any other representative of the defendant had express knowledge that any specific bonus had been adopted by the bankrupt.

As already appears, the subject of bonus was at no time mentioned during the time that the plaintiff continued in the defendant's employ. At the time that he received the sum of $250, on December 29, 1933, he testified that Mr. McLellan, who was chairman of the board of directors of the bankrupt, and who continued in the employ of the trustee, stated that " I got a little present for you. It isn't much, but it will help a little."

As already noted, the bonus claimed was to be based upon a percentage of profits of the bankrupt's business. It is well settled that a contract of this character is not the usual and ordinary contract which one authorized to employ agents and servants may make. It would require express authority. (*Chard* v. *Ryan-Parker Construction Co.*, 182 App. Div. 455; 1 Mechem on Agency [2d ed.], § 988, pp. 711, 712.) The rule is founded upon sound business considerations, and one entering into such a contract is bound to inquire as to the agent's authority. (*Howard* v. *Winton Co.*, 199 Cal. 374; 249 P. 511.)

Under the principle of these authorities, Taylor, the bankrupt's manager of sales, did not have authority to bind the bankrupt to pay the bonus here in question; nor would the bankrupt's president himself have authority so to do. (*Chard* v. *Ryan-Parker Construction Co.*, *supra*.) It is true that if the bonus plan submitted by Powdrell to the board of directors of the bankrupt had provided for payment of a bonus upon the basis and for the period of time claimed by the plaintiff, and had been approved, the bankrupt would be bound, and also the defendant as trustee, if it had agreed with plaintiff to continue him thereunder.

However, the plaintiff failed to show that the bonus plan upon which he bases his cause of action, or, in fact, any bonus plan, was ever formally adopted by the bankrupt's board of directors. While it appears that on March 16, 1932, the stockholders of the bankrupt approved a plan to distribute as a bonus to the employees of the bankrupt's New York office twelve and one-half per cent of the net profits made on "the common stock of the company for the calendar year of 1932," it is to be observed that this plan was not predicated upon the net operating earnings of the company, as claimed by the plaintiff, nor was it to operate for any year but the year 1932.

Furthermore, it appears that this plan was not adopted and authorized by the bankrupt's board of directors. The plan approved by the stockholders was referred to the chairman of the board, the president, the treasurer, and to one Sherman as a committee for the purpose of making definite and complete those features thereof which called for further specifications and to submit the completed plan to the next meeting of the board.

This committee appears to have reported to the board on June 22, 1932, and its report was accepted and directed to be filed with the records of the corporation. What that report was does not appear. It was not offered in evidence, and the defendant claimed that the report could not be found among the records of the bankrupt.

However, if this report had been introduced and found to contain merely the plan which had been recommended and adopted by the stockholders, it would not aid the plaintiff; for, as already noted, that plan was to operate only during the year 1932, and the bonus was to be based, not on the net operating earnings of the company, but upon profits to be made upon common stock.

It is significant that the plaintiff failed to show that any other employee, either of the bankrupt or of the trustee, ever received a bonus as of right based upon any specific bonus plan. No extra compensation either by way of bonus or gift was paid to any

employee in the year 1932. Extra payments ranging from $250 to $1,000 were paid to some nine employees in December, 1933, including the payment to the plaintiff of $250. In March, 1935, after the plaintiff's discharge, bonuses for the year 1934 ranging from $375 to $1,250 were paid to seven employees.

Whatever bonus plan existed as shown in this record, appears to have been as testified to by McLellan, the chairman of the board, a mere allotment made up at the end of the year predicated upon services rendered, the length of employment and the worth of the employee to the company. No specified bonus plan existed, however, especially one to which any employee would be entitled as of right by virtue of a contract.

It is our conclusion, therefore, that plaintiff failed to show that he was entitled to be paid a bonus, either by the bankrupt or by the defendant, and that the complaint should have been dismissed.

It follows that the judgment and order should be reversed, with costs, and the complaint dismissed, with costs.

MARTIN, P. J., McAvoy and UNTERMYER, JJ., concur; GLENNON, J., dissents and votes for affirmance.

GLENNON, J. (dissenting). I dissent from the conclusion reached by the majority. Facts sufficient to sustain plaintiff's cause of action are set forth in the record.

The plaintiff was in the employ of W. T. Grant Company, at New Bedford, Mass. Under date of July 6, 1932, he received a letter from Fred F. Taylor, who was the sales, advertising and merchandise manager of McLellan Stores Company, wherein he was offered a position as buyer. The letter read, in part, as follows: " The position of buyer with the McLellan Stores Company, of course does not rate with the Grant outfit, but with Fred Powdrell at the head of the organization, things are looking brighter for those of us here in the office, and while the salary is small, the position should have a future to it. Our buyers average drawing account for the month is $400, and we have a bonus plan similar to the one that is now in force with the W. T. Grant Co., and I believe that with the organization we are building here, that our company is going to go over in a big way next year and there is an opportunity for a man to double his drawing account on this bonus plan." Later he talked with Mr. Taylor in New York, who advised him, in substance, that a bonus fund made up of twelve and one-half per cent of the operating earnings of the company, would be distributed among the executives, department heads and buyers in proportion to their salaries. Based upon that promise plaintiff accepted a position as buyer on August 1, 1932.

Prior to the time plaintiff entered upon his employment, under date of March 16, 1932, the following resolution was unanimously adopted by the stockholders:

"The general outline of a plan to distribute as a bonus to New York Office Employees of the Company, twelve and one-half per cent ($12\frac{1}{2}\%$) of the net profits made on the common stock of the Company for the calendar year of 1932, after deducting all expenses, preferred dividends, taxes, amortization, depreciation and all other charges, said employees to be designated by the management or the Board of Directors and their participation therein to be on a pro-rata basis in accordance with salaries paid to them, was presented and discussed, after which, upon motion duly seconded and carried, it was unanimously

"Resolved, that said Bonus Plan so presented be and hereby is approved."

Before the plan was voted upon by the stockholders it was approved by the directors and then afterward referred back to the executive committee which acted for the board of directors.

It is quite apparent that the purpose of the plan was to supply a real incentive to the employees who were to share in it to increase the net profits of the company. This plan was modeled after that of the W. T. Grant Company. In answer to a question as to how it was to operate, Mr. Fred A. Powdrell, who was the acting president of the McLellan Stores Company in 1932, and also a director at the time of the trial, when called as a witness by the defendant, said in part: "Well, I think we followed as near the lines we could with the Grant plan, as near as possible, because we had experience with that company, and it had been very successful." The witness further stated that he knew that the plaintiff was going to be employed by the company, having been so advised by Mr. Taylor. Later, on redirect examination by defendant's counsel, he was asked: "Did you ever instruct Mr. Taylor how to explain the bonus plan to Mr. Noyes? A. No. Both men were very familiar with our Grant plan." The plaintiff does not assert that he had any knowledge of the fact that prior to the time he entered the employ of McLellan Stores Company the resolution of the stockholders concerning the bonus plan was adopted. There is no claim on the part of the defendant that he was informed that the resolution was confined to the year 1932. However, I believe that it tends to support plaintiff's contention that in offering the position to him Mr. Taylor did not exceed his authority as manager, when he promised plaintiff that he was to receive a drawing account of $400 a month and also was to share in the "bonus plan similar to the one that is now in force with the W. T. Grant Co." During the year

1932 the company sustained a loss of upwards of $1,000,000, with the result that there was no " opportunity for a man to double his drawing account on this bonus plan."

I have set forth these facts somewhat at length for the purpose of giving a background to the events which later happened.

McLellan Stores Company filed a petition in bankruptcy on January 12, 1933, and the Irving Trust Company was appointed receiver. On the twenty-sixth of the same month the Irving Trust Company was appointed trustee. At the time the petition in bankruptcy was filed McLellan Stores Company operated a chain of 278 department stores throughout the United States. The defendant trustee continued the operation of 234 of the stores. One James B. Simpson acted as representative of the trustee. He was exceedingly successful in handling the business of the bankrupt. All creditors were paid in full together with interest. In fact, the trustee retained the business of the bankrupt as a going concern until May 15, 1935, when all the assets of the bankrupt, with the exception of a fund which was retained as a reserve for claims which might arise, such as we have here, were turned over to the McLellan Stores Company.

If we adopt the figures given by Mr. Simpson upon his examination before trial, we find that in 1934, after allowing depreciation, taxes, amortization and other non-recurring charges, there was a net profit in the operation of the business of $1,343,843.28, and for the first three months of 1935 the net profit was $12,257. About three or four weeks after Mr. Simpson took charge of the business, Mr. Noyes (plaintiff) said: " I remember he told us that we were to know that we were now employees of the Irving Trust Company. In other words, there was to be no change at all in our standing or in the set-up. We were to go right on in our work just exactly as we were doing it for the McLellan Stores Company. The only difference was we were now employed by the Irving Trust Company instead of the McLellan Stores Company." In connection with this statement it should be noted that the order of the Federal court, which authorized the trustee to continue the business, permitted it to " preserve any and all leases and/or contracts made by the bankrupt." It is argued by the plaintiff, and properly so, that the jury was fully warranted in concluding that the defendant was authorized to continue plaintiff's contract of employment and actually did so.

There is considerable testimony in the record to indicate that Mr. Simpson knew that it was customary to pay a bonus to buyers employed in the chain stores business. Mr. McLellan, who was chairman of the board of directors of McLellan's Stores before the

bankruptcy, and became president after, when called as a witness in behalf of the defendant, said in part: " Mr. Simpson had been in the chain store business with the F. & W. Grand Company and with Schulte United, and he knew it was customary to pay bonuses to buyers." In addition thereto he said that, while Mr. Simpson had not been in the chain store business, " he was trustee in bankruptcy for several chain store companies." On being asked, " Q. And if he should say that he never knew of any such custom, would you be surprised?" Mr. McLellan replied, " Very much surprised, very much surprised, from what I knew of Mr. Simpson. He was a very able fellow, very." Furthermore, he testified in substance that at the time Mr. Simpson took charge of the bankrupt, the bonus plan was explained to him. He said in answer to a question: " Well, I told him that we usually gave a bonus at the end of the year if the company made money. He said: ' Well, that's all out for the present anyway.' " However, Simpson failed to disclose to the plaintiff and his fellow employees that they were not to share in the profits pursuant to the promises which had been made. Had he done so the probabilities are that the defendant would not have been in a position to have inserted in its report to the United States District Court that " The morale of the organization had to be maintained at a high peak."

I do not believe there is much force to the argument advanced by the defendant that the plaintiff did not make a demand for his share of the profits until March, 1935. During the period of his employment, the first year that there was an actual net profit, as we have seen from the figures, was 1934. The amount thereof could not have been ascertained until the early part of January, 1935.

Since the questions presented by this record are primarily questions of fact rather than of law, it seems unnecessary to discuss the authorities relied upon by the majority as they are not applicable to this case.

I vote to affirm.

Judgment and order reversed, with costs, and the complaint dismissed, with costs.