JAMES N. VEAZEY, Appellant, v. HENRY ALLEN et al., as
  Copartners under the Firm Name of HENRY ALLEN &
  Co., Respondents.

1. APPEAL — NONSUIT. The dismissal of the complaint after the plain-
tiff had rested in an action to compel an accounting for profits alleged to
have been made by the defendants in speculating in the stock of a cor-
poration, part of which profits by certain agreements were alleged to
belong to the plaintiff, " upon the ground that each of the agreements set
forth in the complaint was and is contrary to public policy and void, and
that the plaintiff, therefore, has no cause of action against the defendants
upon either of said agreements," is a nonsuit, and the plaintiff is entitled
to have it reviewed in the light of the facts and inferences most favorable
to him.

2. CONTRACT — AGREEMENT FOR PROCUREMENT OF LEGISLATIVE
ACTION FOR THE PURPOSE OF DEPRECIATING PRICE OF CORPORATE
SECURITIES VOID AS AGAINST PUBLIC POLICY. A contract which con-
templates the procuring of legislative action for the sole purpose of
depreciating the market value of the securities of a corporation and pro-
vides that any profit, arising from speculating in such securities by
selling them short and covering at the anticipated decline, is to be
divided between the parties, is void as against public policy and will
not be enforced by the courts.

*Veazey* v. *Allen*, 61 App. Div. 119, affirmed.

(Argued October 13, 1902; decided February 10, 1903.)

APPEAL from a judgment of the Appellate Division of the
Supreme Court in the first judicial department, entered May
24, 1901, affirming a judgment in favor of defendants
entered upon the report of a referee.

In this action the plaintiff seeks to compel the defendants
to account to him for certain profits alleged to have been
made by the latter in speculating in shares of the capital stock
of two corporations known as the Distilling & Cattle Feeding
Company and the American Sugar Refining Company. The
defendants were copartners engaged as stockbrokers under
the firm name of Henry Allen & Company, in the city of
New York. The plaintiff's claim, briefly stated, is that the
defendants, in consideration of his supplying them with infor-

mation concerning an investigation into the affairs of the corporations referred to, which he was to procure to be made by the United States Congress, would sell the stocks of those corporations, buy them again at a lower price, the decline in price being caused by the congressional investigation, and divide with him the profits so made. At the end of the plaintiff's case the referee, before whom the case was tried, upon motion of counsel for the defendants, dismissed the complaint on the ground that the contracts set forth therein were void as against public policy. The Appellate Division has affirmed the judgment entered upon that decision.

In 1891 the Distilling & Cattle Feeding Company was organized. This corporation was commonly known as the "Whisky Trust." Its chief business was the manufacture and sale of alcoholic liquors. It appears from the record that this company, instead of manufacturing these liquors by the ordinary processes, made them by mixing white spirits with various essences, syrups, oils and other deleterious substances in such a way that liquor of any kind, color and apparent age could be produced upon demand. Its business was soon extended over a great part of this country, being transacted through distributing agents located at various commercial centers. These agents sold the products of the company on what was called a rebate plan, which consisted in selling to customers on an agreement that if they would not deal in goods of any other concern which competed with the Whisky Trust, they would receive a rebate or discount upon the price paid at the end of six months. This manner of transacting business soon became a serious menace to the business of those concerns which dealt in what was known as "straight goods," that is, manufacturers of alcoholic liquors manufactured and disposed of in the ordinary way. Its effect was also to throw many traveling men, employed by independent competitors, out of employment. In the language of the plaintiff "it had driven many men off the road."

At that time the plaintiff was employed as a traveling salesman by the firm of Tullidge & Co. of Cincinnati, who were

manufacturers of "straight" whisky.  He and his employers were interested in checking the growth of the business of the "Whisky Trust" and shutting it out of the market.  Plaintiff had been connected with the whisky business for a number of years, and had also been in the essential oil business, and was thoroughly conversant with the details of both.  Almost from the inception of the so-called Whisky Trust he had been agitating the question of how to check its encroachments upon the business of the dealers in "straight goods."  He had consulted with many persons upon the subject, and had been considering the plan of going to Washington to see if he could accomplish his object through the Federal authorities.

In 1892 the plaintiff became acquainted with Judge Veazey, a member of the Interstate Commerce Commission, and his son-in-law Walton.  During that year plaintiff discussed with Walton the subject of a congressional investigation into the affairs of the "Whisky Trust," and the probable effects of such an investigation upon the price of the stock of that corporation.  Walton suggested to plaintiff that there might be some pecuniary benefit to plaintiff from such an investigation, and that he could introduce him to some persons in New York who could help him.  In pursuance of this suggestion the plaintiff went to New York and was there introduced by Walton to a lawyer by the name of Flagg.  The latter told plaintiff that there would probably be an opportunity to make considerable money out of the decline of the Distilling & Cattle Feeding Co.'s stock, providing that the representations he made in regard to that company and its methods were true; that they should be exposed, and that he thought it would be well for the plaintiff to consult some broker in New York.  Soon after this conversation, which took place at Flagg's house, and on January 5th, 1893, the latter introduced the plaintiff to the defendant Allen at the New York Club.  Plaintiff told Allen that he thought he would bring about a congressional investigation into the affairs of the Distilling & Cattle Feeding Co., and that he would furnish him with all information in connection with that investigation that would

tend to affect the stock of that company. Allen asked for information concerning the company and plaintiff told him about its operations. Allen replied that if the facts regarding the operation of the business of the trust were as represented by the plaintiff and proven and publicly developed it would undoubtedly result in seriously affecting the market value of that stock on the stock market, and he suggested that there would be an opportunity for the plaintiff to make some money in giving him information relative to the possible action taken in Washington. Allen requested plaintiff to furnish him with any information he had or that might come to his knowledge affecting or tending to affect in any way the value of the stock of the Distilling & Cattle Feeding Co. Plaintiff thereupon asked Allen how he proposed that plaintiff should make any money. Allen replied that if the plaintiff would furnish him with information regarding that matter, when they proposed to introduce the resolution and any subsequent steps that were taken in that matter in Washington that he would sell 3,000 shares of the stock of that company when they were ready to begin investigation over there, without requiring plaintiff to put up any margin, and that Allen would return to the plaintiff the profits which would accrue from the sales of such stock. Plaintiff accepted this proposition and testified that Allen stated to him that in making it he was acting on behalf of the firm of Henry Allen & Co. Plaintiff thereupon proceeded to Washington, where he was introduced to Mr. Burrows, a member of the house of representatives, through Judge Veazey and Walton. He succeeded in interesting Mr. Burrows in the matter by fully informing him of the methods employed by the Distilling & Cattle Feeding Co. in conducting its business, and demonstrated to him by actual experiments its method of producing different kinds of liquors by the use of the deleterious essential oils and compounds above described. Plaintiff talked with other members of Congress, and through his efforts Mr. Burrows, on January 13th, 1893, introduced a resolution in the Federal house of representatives calling for an investigation into the affairs of the

Distilling & Cattle Feeding Co.  This resolution was finally
referred to a sub-committee of the judiciary committee of the
house, before which hearings were had, commencing on Feb-
ruary 4th and continuing at intervals until February 27th,
1893, when the last hearing was had.  Plaintiff appeared as a
witness before the sub-committee and there gave testimony in
connection with which he again demonstrated by actual
experiments the methods employed by the Distilling & Cattle
Feeding Co. in producing its goods and described its mode of
conducting its business.  He not only appeared as a witness
himself, but suggested the names of other witnesses, attended
during nearly all the hearings, supplied information to the
committee from time to time, and did what he could to pro-
mote and continue the investigation.  He was in fact the
prosecuting witness and was referred to as such by the chair-
man of the sub-committee.

Subsequent to the introduction of the resolution authoriz-
ing the congressional investigation it was amended so as to give
the committee power to investigate the affairs of all " trusts "
doing business in restraint of trade, and under this amend-
ment the affairs of the American Sugar Refining Company
were inquired into somewhat and plaintiff suggested witnesses
and took some part upon this branch of the inquiry.  In a letter
written June 27th, 1893, to the president and governing com-
mittee of the New York Stock Exchange, the plaintiff stated
that pursuant to his agreement with Allen he had instituted
this investigation and, at his own expense and by his own
efforts, had furnished the testimony for the investigation, with
the result that there was an immediate fall in price of the
stock of said corporation.  In the same letter the plaintiff
stated that after January 17th, 1893, he and Allen agreed to
proceed upon the same basis against this stock ; that further
efforts were made by him, resulting in a further decline of the
stock and that on the 1st of February, 1890, the arrangement
was continued as before.  Again in the same letter the plaintiff
stated that during the month of February (1893) a heavy
decline occurred in said stock and that Mr. Allen then desired

him, in addition, to aid in breaking the market in sugar and would give him one-half the profits which might result from the effort; that pursuant to this agreement he set such measures at work as were necessary, with the result that sugar declined heavily.

The record shows that between the date of plaintiff's going to Washington, about January 5th, 1893, and March 7th following, he was in almost constant communication with the defendants by telegraph, telephone, mail and personal interviews. In some of his telegraphic dispatches he used a cipher code furnished him by defendants. From these communications it appears that plaintiff kept the defendants well supplied with information concerning the success of his efforts in bringing about the investigation and the progress of the proceedings before the sub-committee, both in regard to the affairs of the Distilling Company and the American Sugar Refining Company. Many replies to these communications were received by him from the defendants, advising him of the condition of the stock market and requiring further information. On January 17th, 1893, plaintiff received a letter from Allen inclosing a certificate of deposit for the sum of $6,237.50 for himself and Walton, whom the plaintiff had employed to aid him in his operations. This letter stated that the amount inclosed was the profit on the operations in the stock of the Distilling & Cattle Feeding Co. On or about February 1st, 1893, plaintiff received from Allen personally a further sum of $10,700.00.

After the first agreement of defendants to sell 3,000 shares of the stock of the Distilling Company for plaintiff's benefit as above set forth, and on or about January 17th, defendants entered into another agreement with plaintiff to sell 3,000 more shares of stock on the same terms. On or about February 1st, 1893, the defendants entered into a further agreement with plaintiff by which he was to receive one-half of the profits made by them in their operations, not only in the stock of the Distilling Company, but also in the stock of the American Sugar Refining Company. It is admitted that the

defendants on the 13th and 14th of January, 1893, sold 3,000 shares of the Distilling Company's stock, and on the 24th and 25th of the same month they sold 3,000 shares more of the same stock, and that 6,000 shares were purchased between January 16th and 31st. It is also admitted that the defendants had transactions in the stock of the American Sugar Refining Co. between February 1st and March 4th, 1893.

The complaint set forth four separate causes of action. The first cause of action sets forth the facts relating to the sale by the defendants for the plaintiff's benefit of the 3,000 shares of stock of the Distilling & Cattle Feeding Company, and it is alleged that the $6,237.50 received by plaintiff did not represent all the profit arising therefrom. The second relates to the sale of the second 3,000 shares of the same stock and alleges that the $10,700.00 received by plaintiff did not represent all the profit on such sale. The third relates to the further operations of the defendants in the same stock wherein plaintiff was to have one-half of the profits which are claimed to have amounted to upwards of $500,000.00. The fourth is in substance the same as the third, except that it relates to the operations in the stock of the American Sugar Refining Company. The answer puts in issue all the material allegations of the complaint. As separate defenses it sets up settlement of accounts and payment and that the contracts set forth in the complaint are illegal and void because they contemplated an agreement by plaintiff to solicit and influence members of Congress to pursue an investigation into the affairs of the Distilling & Cattle Feeding Company in which plaintiff's sole object was to cause a decline in the value of the stock of that company.

*Sidney G. Stricker*, *Herbert R. Limburger*, *Edward Lauterbach* and *Edgar M. Johnson* for appellant. The judgment is a mere nonsuit. Consequently the only question is whether there was any evidence to support a cause of action, and the evidence to support a cause of action being ample and complete, the judgments below must be reversed.

(*Place* v. *Hayward*, 117 N. Y. 487; *Raabe* v. *Squier*, 148 N. Y. 81; *Bliven* v. *Robinson*, 152 N. Y. 333; *Ware* v. *Dos Passos*, 162 N. Y. 281; *Scofield* v. *Hernandez*, 47 N. Y. 313; *Forbes* v. *Chichester*, 125 N. Y. 769; *Woodbridge* v. *F. Nat. Bank*, 166 N. Y. 238; *D. & C. F. Co.* v. *People*, 156 Ill. 448; *White* v. *Drew*, 56 How. Pr. 53.) The agreements sued upon were legal, and it was error to hold them void as against public policy, for the reasons that: The contracts did not contemplate the use of any unlawful means on the part of Veazey in pursuading Congress to investigate the Whisky Trust. Nor did the fact that Veazey was to be paid in profits to be made by selling stocks short vitiate the agreement. Nor was the investigation sought for any unlawful purpose, the object of the investigation being merely to elicit the truth regarding the practices of the Whisky Trust. (*Dowley* v. *Schiffer*, 13 N. Y. Supp. 552; *Ormes* v. *Dauchy*, 82 N. Y. 443; *Maloney* v. *Nelson*, 12 App. Div. 545; *Curtis* v. *Gokey*, 68 N. Y. 300; *Chesebrough* v. *Conover*, 140 N. Y. 382; *Dunham* v. *H. P. Co.*, 56 App. Div. 244; *Southard* v. *Boyd*, 51 N. Y. 177; *Cummins* v. *Barkalow*, 1 Abb. Ct. App. Dec. 479; *Trist* v. *Child*, 21 Wall. 441; *D. & C. F. Co.* v. *People*, 156 Ill. 448.)

*Charles F. Brown*, *Charles H. Brush* and *John J. Crawford* for respondents. The agreements testified to by the plaintiff were contrary to public policy, and void. (*Campbell* v. *Seaman*, 63 N. Y. 568; *Cogswell* v. *N. Y. C. & H. R. R. R. Co.*, 103 N. Y. 10; *Bohan* v. *P. J. G. L. Co.*, 122 N. Y. 18; *Booth* v. *R., W. & O. R. R. Co.*, 140 N. Y. 267, 274; *Dunham* v. *H. P. Co.*, 56 App. Div. 244; *Barry* v. *Capen*, 151 Mass. 999; Greenhood on Pub. Policy, 194; *Freeman* v. *Stone*, 42 Barb. 169; *Adams* v. *Page*, 7 Pick. 541; *Lumley* v. *Guy*, 2 E. & B. 216; *Oscanyan* v. *Arms Co.*, 103 U. S. 261.) The appellant's contention that the judgment appealed from is one of nonsuit only, and that it must be reversed if there is any evidence to sustain the plaintiff's contention, is wholly unimportant upon this appeal. (*Gray* v. *Hook*, 4

N. Y. 449.) The contracts sued upon being illegal, no recovery can be had thereon, and the complaint was properly dismissed. (*Marshall* v. *B. & O. R. R. Co.*, 16 How. [U. S.] 153; *Tool Co.* v. *Norris*, 2 Wall. 49; *Hunt* v. *Hunt*, 40 N. Y. 543; *Planters' Bank* v. *Union Bank*, 16 Wall. 483.)

WERNER, J. Before proceeding to discuss the question whether the contract, under which the plaintiff makes his claim, is void as being repugnant to public policy, it may be well to fix the point of view from which it is to be considered. The learned counsel for the appellant asserts that it makes a vital difference in the case whether the referee's decision is to be regarded as a determination upon the merits, or whether it is to be treated simply as a nonsuit. It appears that after the plaintiff had rested his case, counsel for the defendants moved for a dismissal of the complaint on various grounds, one of them being that the contract testified to by the plaintiff was void as against public policy. After this motion had been made and discussed, the referee twice adjourned the further hearing of the case, when he made his decision in the short form, in which he finds and decides "that the defendants are entitled to judgment herein against the plaintiff dismissing the plaintiff's complaint," and directs judgment accordingly, "upon the ground that each of the agreements set forth in the complaint was and is contrary to public policy and void, and that the plaintiff, therefore, has no cause of action against the defendants upon either of said agreements." As the "agreements" referred to in the decision are all of the same character and involve but one question, we shall refer to it as a single contract.

In form, and according to the decided cases, the referee's decision was simply a nonsuit, and the plaintiff is entitled to have it so treated. (*Scofield* v. *Hernandez*, 47 N. Y. 313; *Place* v. *Hayward*, 117 N. Y. 487; *Raabe* v. *Squier*, 148 N. Y. 81.) Such a decision gives a defeated plaintiff the right to have it reviewed in the light of the facts and inferences most favorable to him. In the case at bar this question

is one of form rather than substance because, in either event, the ultimate question to be decided is whether the contract made by the parties under the conditions and circumstances testified to by the plaintiff is valid or void.

This contract is assailed on the ground of public policy. Lord Brougham defined public policy as " that principle of the law which holds that no subject can lawfully do that which has a tendency to be injurious to the public or against the public good, which may be termed the policy of the law, or public policy in relation to the administration of the law." In many of its aspects the term " public policy " is but another name for public sentiment and, as that is often transitory or shifting, it lacks the permanency upon which fixed principles of law are, or should be, based. There are, however, other phases of public policy which are as enduring and immutable as the law of gravity. One of them is that, as applied to the law of contracts, courts of justice will never recognize or uphold any transaction which in its object, operation or tendency is calculated to be prejudicial to the public welfare. That sound morality and civic honesty are corner stones of the social edifice is a truism which needs no re-enforcement by argument. It may, therefore, be taken for granted that whenever our courts are called upon to scrutinize a contract which is clearly repugnant to sound morality and civic honesty, they need not look long for a well-fitting definition of public policy, nor hesitate in its practical application to the law of contracts. This is no new doctrine, for it was the law in the time of Lord Chief Justice Wilmot, when he said, " It is the duty of all Courts of Justice to keep their eye steadily upon the interests of the public, even in the administration of commutative justice; and when they find an action is founded upon a claim injurious to the public and which has a bad tendency to give it no countenance or assistance in *foro civili.*" (*Low* v. *Peers*, p. 378, Wilmot's Notes.)

Let us now look at the contract which the plaintiff seeks to enforce in this action. It is, in effect and substance, a contract to pay the plaintiff the whole, or a part, of the profits

resulting from speculations in the stock of a corporation, undertaken by the defendants pursuant to advance information furnished them by the plaintiff, as to the probable course and developments of a congressional investigation into the affairs and methods of said corporation, instituted and encouraged by the plaintiff as a prosecuting witness, and in other ways. The investigation was intended to and did seriously impair the reputation of said corporation and resulted in a substantial decline in the market price of its stock. This was the end aimed at in said contract. The plan agreed upon between the plaintiff and the defendants contemplated the sale, at a given price, of stock which they did not have, but which they expected to be able to purchase at a lower price in consequence of the investigation referred to. The anticipated profit was to be the difference between the selling and purchasing price of the stock. The allegations of the complaint suggest the great extent to which the plaintiff believed he was to be benefited by the defendants' operations under this contract, and the answer admits enough to prove that plaintiff's interest in it was, at least, a substantial one. The fidelity and zeal with which the plaintiff performed his part of the contract is clearly shown by the voluminous telegraphic and written correspondence which appears in the record. In its final effect we have here a case in which it is alleged and proved that the consideration of the contract sought to be enforced is the fruit of a legislative investigation, instituted, prosecuted and encouraged by the plaintiff. That such a contract is one which, in its object, operation and tendency, is calculated to be prejudicial to the public welfare, ought not to be doubted for a moment. Why? Not because the plaintiff was in fact necessarily dishonest or corrupt in instituting and prosecuting the investigation; nor yet because the charges preferred against the offending corporation were not true, but because the plaintiff voluntarily acquired a pecuniary interest in the result of the investigation, which might subject not only him, but through him others, to the temptations and allurements which human experience

24

has proven to be potent in sacrificing sound morality and honesty to that greed and cupidity which not infrequently beget perjury, bribery and other moral delinquency, incompatible with the public weal.

But just here counsel for the plaintiff interjects the suggestion that he is entitled to all the favorable inferences that may be drawn from the testimony; that since his efforts to procure an investigation were begun before the making of the contract in suit it is not to be presumed that he was or could be improperly influenced, or that he would be led to improperly influence others, by the financial interest which he subsequently acquired in the results of the investigation. It is true that under the rule entitling the plaintiff to all the favorable inferences that may legitimately be drawn from the testimony, we must assume that plaintiff's first efforts to procure a legislative investigation of the corrupt and evil methods of the " Whisky Trust " were innocent and commendable, but it is equally true that before his laudable efforts had borne any fruit he changed his *status* from that of a disinterested citizen to that of an interested party. His original purpose, to protect and preserve the legitimate business with which he had long been identified, against the unlawful and insidious encroachments of an unscrupulous corporation, was commendable and worthy. Had he persevered in his first designs and motives their effect upon the public would have been above criticism. But favorable inferences cannot stand against positive testimony. It is in evidence that before the plaintiff's early efforts to obtain governmental aid had promised any results, he entered into the contract in suit. Over his own signature the plaintiff declared his inability to proceed without financial aid, and later on, in the same unequivocal manner, he admitted that pursuant to the contract under discussion he instituted the investigation, at his own expense and efforts furnished the testimony, and procured the result which eventuated in the profit which he now seeks to recover. It is, as the referee herein has well said, " the right of every citizen to petition a legislative body in respect to any existing

matter or condition of things within its jurisdiction, which may be prejudicial to his personal rights or interests, or which he may deem to be a public evil, and to lay before the body, by proper means and in a proper manner, the grounds of his complaint and his reasons for demanding its intervention."

Had the plaintiff maintained the attitude of such a petitioner he could not now be criticised. But when he has voluntarily abdicated that position for one in which his every movement is coupled with an interest that cannot be disassociated from ultimate gain or loss, depending in some degree upon the success of his own efforts, it is not difficult to see that he is no longer purely an advocate for the public good, but an interested party seeking to further his own ends by means that may be, if they are not in fact, immoral, corrupt and destructive of public welfare. Although there are no cases directly in point, we think the principle underlying these views is sustained by many authorities. In *Mills* v. *Mills* (40 N. Y. 546) the action was brought to enforce specific performance of a contract to convey land, the consideration for which was the plaintiff's agreement to give all the aid in his power * * * and to use his interest, influence and exertions to procure the passage of a law granting to the defendant and others the right to build and operate a railroad. In holding the contract void this court said : " It is not necessary to adjudge that the parties stipulated for corrupt action or that they intended that secret and improper resorts should be made. It is enough that the contract tends directly to those results. It furnishes a temptation to the plaintiff to resort to corrupt means or improper devices to influence legislative action." In *Atcheson* v. *Mallon* (43 N. Y. 147) it was held that an agreement between parties tending to lessen rivalry in bidding upon public work was void as against public policy, even though it did not appear that the agreement was actually detrimental to public interests. In *Richardson* v. *Crandall* (48 N. Y. 348) the plaintiff was engaged in furnishing men to fill the quotas of certain counties for military service under a call from the president. The defendant as provost marshal exacted from

the plaintiff a bond that the men furnished would not desert. It was held that any discretion which the provost marshal had should have been exercised, uninfluenced by the security exacted, and the taking of the pledge was, therefore, against public policy. To the same effect is *Tool Company* v. *Norris* (2 Wall. 54), where it was held that an agreement to procure from the government a contract for firearms was offensive to public policy and, therefore, void. So, a contract for "lobby services" to secure the passage of a bill providing for the payment of a claim, has been held void by the Supreme Court. (*Trist* v. *Child*, 21 Wall. 441.) In *Meguire* v. *Corwine* (101 U. S. 108) it was held that a contract between A and B, whereby the former agreed to secure the appointment of the latter as special counsel in certain government cases, and to assist him in the defense thereof, upon the consideration that A should have one-half of the fee received by B, was contrary to public policy. To the same effect is *Oscanyan* v. *Arms Co.* (103 U. S. 261).

The authorities relied upon by the plaintiff appellant are distinguishable from the case at bar and those cited in support of the judgment herein. It is a fundamental principle of the common law that what a person may lawfully do for himself he may do through his agents and servants. Early in the history of this court that principle was applied to a contract by which one party agreed, for compensation, to aid another in prosecuting a claim against the state. This court said : "A party who has a claim against the State may employ persons to present and urge it, with proofs and arguments, before the tribunal authorized to act upon it. This is not within the principle which renders agreements to compensate a person for privately soliciting individual members of the legislature, or other public bodies, to act in favor of a claim or measure, void." (*Sedgwick* v. *Stanton*, 14 N. Y. 289.) Similar cases in the Supreme Court are *Russell* v. *Burton* (66 Barb. 539), and *Cary* v. *Western Union Tel. Co.* (20 Abb. N. C. 337). In *Chesebrough* v. *Conover* (140 N. Y. 382), which is strongly relied upon by the plaintiff, this court

reiterated the rule that "it is the right of every citizen interested in any proposed legislation to employ, and agree to pay, an agent to draft a bill, and fairly and openly to explain it to a legislative committee, or any member of the legislature, and ask to have it introduced; and a contract which does not call for more, and services under it which do not go further, are not against policy." In that case there was, however, a question of fact as to what the agreement was, and that question was fairly submitted to the jury under proper instructions. By their verdict for the plaintiff the jury decided that the contract was one for purely professional services, and it was in the light of this finding that the judgment was sustained, although this court took occasion to say: "If the plaintiff was employed to render what are commonly called lobby services in procuring legislation desired by the defendant, then he should have been defeated in his action. Such contracts are condemned as against public policy, and the rules applicable to them are laid down in many decisions." (Citing cases.)

The foregoing list of cases might be swelled by many others to illustrate the variety of conditions under which questions of public policy have had to be considered in determining the validity of contracts; but enough have been cited to show how different is the case at bar from all others that we have seen, and how obviously applicable to the contract in suit is the principle of public policy which forbids the enforcement of such contracts as may in their nature be injurious to the public. This is not the case of a person employed in a professional capacity to work openly and publicly in a matter of legislative concern, but of a man who agrees to furnish the testimony for a legislative investigation, in exchange for a share of the profits which such an investigation will produce to one who is favored with inside and advance information as to its probable progress and effect.

The judgment below should be affirmed, with costs.

PARKER, Ch. J., GRAY, HAIGHT, MARTIN, JJ. (and CULLEN, J., in result), concur; BARTLETT, J., not voting.

Judgment affirmed.