VINCENZO RELLA, Respondent, v. NATIONAL CITY BANK OF NEW YORK, Appellant.

First Department, April 6, 1934.

*David S. Konheim* of counsel [*William Lurie*, attorney], for the appellant.

*Otto C. Sommerich* of counsel [*Maxwell C. Katz* and *Raymond T. Heilpern* with him on the brief; *Katz & Sommerich*, attorneys], for the respondent.

O'MALLEY, J. Prejudicial error requiring a new trial was committed. The defense was predicated upon a corrupt and illegal agreement on the part of the plaintiff and the defendant's employee, Lupis, whereby the plaintiff and his wife, for whom he sued as assignee, were to be paid ten per cent, instead of three per cent interest regularly allowed by the defendant. In consummating the fraud a credit in the sum of $16,500 for a deposit of only $14,583.65 was given. Whether this was the arrangement or whether the sum of $16,500 was actually deposited, as claimed by the plaintiff, was a sharply contested issue. The defendant was, therefore, entitled to have the jury fully and clearly instructed upon the law applicable.

While the court in the main charge in substance instructed the jury that the plaintiff could not recover if they found that a conspiracy between himself and Lupis to defraud the defendant existed, the force of this instruction was later nullified. The ultimate result of the court's decision on requests to charge made by counsel for both parties left the jury in confusion as to whether plaintiff was entitled to recover the entire amount sued for or should be subjected to a nonsuit. Upon this record the jury had before them only this alternative. They would not be justified in returning a verdict in plaintiff's favor for the lesser amount claimed by Lupis to have been received from the plaintiff and his wife. If the jury found that Lupis had obtained the lesser amount, they necessarily would also find that the corrupt agreement to defraud the bank had been entered into and carried out to the extent of granting the plaintiff and his wife a credit in excess of that to which they were entitled. In such circumstances public policy requires that no recovery be had by a ·party to the fraudulent

scheme. (*Veazey* v. *Allen*, 173 N. Y. 359, 368; *Sirkin* v. *Fourteenth Street Store*, 124 App. Div. 384; *Sayres* v. *Decker Automobile Co.*, 239 N. Y. 73.)

That the jury were in doubt as to whether Lupis had received the greater or lesser amount is shown by a request from the foreman before the jury had retired. He asked whether the jury could " reach a verdict of less than $16,500," to which the learned justice replied: " That is within the province of the jury, you may, but you should decide the case upon the facts that have been given. You should take into consideration the facts adduced by both sides."

This instruction was erroneous. In no view of the plaintiff's case could the jury return a verdict of less than $16,500. They were required to bring in a verdict for such sum or a defendant's verdict. As already stated, a finding for the plaintiff in the lesser amount would necessarily include a finding that the fraudulent conspiracy between plaintiff and Lupis had been carried out to the extent that a false credit in favor of plaintiff and his wife had been entered upon the defendant's records. Under the authorities cited no party to such a scheme could thereafter recover any sum against the party sought to be defrauded. In view of this state of the record justice requires a reversal of the judgment and the granting of a new trial.

It follows, therefore, that the judgment and order should be reversed and a new trial ordered, with costs to the appellant to abide the event.

FINCH, P. J., and TOWNLEY, J., concur; MARTIN and GLENNON, JJ., dissent and vote for affirmance.

GLENNON, J. (dissenting). We are in accord with the views of Mr. Justice O'MALLEY expressed in his opinion that the court erred in instructing the jury that it was within its province to reach a verdict of less than $16,500, the amount for which the action was brought. However, the fact remains that the jury brought in a verdict for the full amount sued for with interest.

There is no doubt that, if plaintiff entered into a corrupt and illegal agreement with defendant's employee Lupis to defraud the bank, he would not be entitled to receive a favorable verdict.

We do not believe that the plaintiff should be put to the expense of a retrial of this action, based solely upon a series of requests to charge, which, apparently, were calculated to confuse the court and jury in the hope that, in the event of an adverse verdict, prejudicial error might be found in the record.

The following facts were established by the verdict of the jury: Lupis was employed by the Bank of America as a teller and had authority to open accounts and accept deposits at the Two Hundred and Twelfth Street and White Plains Avenue branch of the bank. Plaintiff and Lupis were acquaintances from childhood days in a small town in Italy. Plaintiff had a checking account with the Irving Trust Company in which he carried a large balance. Lupis repeatedly requested plaintiff to open an account with the Bank of America in order to promote Lupis' standing in the bank. Plaintiff and his daughter Mary Rella, who generally advised him on money matters, due to his ignorance of English, went to the Two Hundred and Twelfth Street branch of the bank on December 31, 1930. Plaintiff delivered to Lupis, who was in the teller's cage, his check drawn upon the Irving Trust Company to the order of the Bank of America, in the sum of $10,000, and $1,000 in cash. At his request there were issued to Rella by the Bank of America two pass books, one in his name and one in the name of his wife, each containing the entry of a deposit on December 31, 1930, of $5,500. On further solicitation on the part of Lupis to increase his account with the bank, Rella, on June 3, 1931, made an additional deposit for the purpose of bringing his balance in the bank to the sum of $16,500. It was made up of interest on the previous credit balance, cash, small checks from third persons and two large checks, one in the sum of $4,000, and the other in the sum of $583.65. The check for $4,000 was a cashier's check of the North Side Savings Bank, drawn to Rella's order, indorsed by him in blank, then indorsed by the Bank of America, which collected the proceeds through the New York Clearing House. The other check in the sum of $583.65 was Rella's personal check drawn on the Irving Trust Company to the order of the Bank of America. That check admittedly passed through the Clearing House on June third. The facts just related were established by the jury's verdict.

It was the contention of the defendant that all of the transactions took place at Rella's home; that the pass books were delivered by Lupis to Rella; further, that the deposits made by the plaintiff were represented by the three checks in evidence, aggregating $14,583.65; that the balance of the amount which appears in the pass books represented interest at the rate of ten per cent credited by Lupis in advance, pursuant to his agreement, and that the whole transaction was part of a conspiracy by Rella and Lupis to defraud the bank of the difference between the amount credited in the pass books and the sum actually received by the bank.

As we read the testimony of Lupis, we cannot help but note that

he is not worthy of belief. He concededly forged the name of the plaintiff and plaintiff's wife in order to withdraw from the bank the funds which were credited to the Rella accounts. Not only that but, in addition thereto, he made false entries in the books of the bank in an attempt to conceal his crimes. It is clear that he had a motive to commit perjury since thus far he has not been convicted for any of his crimes. Why he has not been prosecuted does not appear.

In reference to the circumstances which led up to the opening of these accounts, he asserted that Rella told him he was not satisfied with the interest he was drawing from his bank. He quoted the plaintiff as saying, " I am not a man to be satisfied with three or three and one-half per cent I get from the banks. * * * My gracious, you are long enough with the bank, perhaps you could be in a position to fix me up in some way I could get at least ten per cent interest on my money." Lupis replied, " Well, listen, * * * perhaps I could fix you up, because I am in the bank, but provided that any transaction that I will do with you, it will be only a private transaction between you and I. Regardless of what happens, you are to keep your mouth shut." He said, " That is all right, that is all right, we will fix you up. So then I asked him * * * what amount of money he would like to invest. He said ' Well, at least $10,000.' 'All right,' I said, ' if you give me $10,000, we have to stipulate an agreement where you will get the $10,000 in a year's time, provided you leave the money with me for a year's time and I will give you some kind of a proof, some kind of an agreement, showing that in the end of the year you will get the return of $11,000.' " He then related how he went over to plaintiff's house on the night of December 30, 1930. He brought along two ledger cards and had them signed on the top, in the usual way for the opening of a thrift account. Each account was credited with the sum of $5,500. He then wrote on each card, " For special agreement this amount will be paid one year from date." Before Rella and his wife signed the " agreement," Miss Rella, the daughter, explained in Italian, after Lupis had already done so, the meaning of these words, and they signed it. He further testified with respect to the cards, " Well, I make the entry on the first line of $5,500 on each card, which was $5,000, part of that check, and $500 accrued interest in advance, and then I wrote, ' The above amount is due and payable on December 31, 1931 ' * * * and I explained the meaning of this wording in Italian to Mr. Rella, in the presence of his wife and his daughter." He then claimed that in the month of June, 1931, the plaintiff approached him with a view of investing an additional $5,000

under similar conditions. He fixed the date of the second transaction as of June 3, 1931. He said he received the checks about nine o'clock in the evening of that day at plaintiff's home. However, he overlooked the fact, in giving this testimony, that the two checks which were delivered by Rella to him had been deposited in the bank during the business hours of the day of June third, and that they passed through the Clearing House after the close of banking hours. When his attention was called to this incident and realizing that the records indicated that his testimony in regard to the receipt of the checks at nine o'clock at night was contradicted by the notation on the checks, he simply moved the date back to the night of June second.

If we give full credit to the testimony of this very unreliable witness, we doubt that there is sufficient in the record to spell out a corrupt and illegal agreement, which had for its purpose an intent to defraud the defendant bank. Take, if we will, as true, the admissions which the plaintiff is said to have made in March, 1932, before this suit was commenced, still we find nothing to indicate a conspiracy to defraud the bank. It appears that an assistant comptroller of the defendant bank and four other men, including the attorney of record for the bank in this case, and a private detective, saw plaintiff in his home at that time. What plaintiff is alleged to have said in reference to opening an account, according to the assistant comptroller, is the following: " Mr. Lurie at that time I believe took up the conversation and asked Mr. Rella how the account was opened, under what circumstances the account was opened, and Mr. Rella stated that Lupis was a friend of the family and had been for some time, and that Lupis had come to his home, I think it was back in December of the previous year, and asked him to open an account with the bank. Rella stated that he had had several accounts and did not see the need of another account or another savings account, and Lupis told him that he could make it worth his while if he opened an account, as a matter of fact, the Bank of America had a special fund which they had set aside out of which — well, in which only widows and orphans could participate.

" Q. Is that what Rella said? A. And Rella told us that, and that the bank paid ten per cent interest on all moneys that were left a year in that account. Rella says, well, he says, ' that was better than three per cent that I was getting on my other accounts,' so he said, ' I decided to open an account with Lupis.' However, if I remember the story correctly now, they did not open the account that day, Lupis went back a few days later, Rella tells us, and at that time Mr. Rella gave Lupis a check for $10,000 and, as he

said, a thousand dollars in cash, to open this account. The pass books Mr. Rella stated were delivered a few days later. ˙ That's all.''

It will be noted that we are not concerned at the present time with the statement of this witness, that the transactions are alleged to have occurred in plaintiff's home. We do not deem it important to discuss that question since the court instructed the jury in substance, that if it found that these transactions took place outside of the bank, plaintiff could not recover.

If we place any credence upon the testimony of Lupis that the transaction was a personal one, wherein the bank was not involved and whereby Lupis was to invest plaintiff's money in such a way that it would earn ten per cent, surely that would not be a fraud on the bank.

If, on the other hand, we assume as true that Rella admitted on being interrogated at his home that Lupis stated that the Bank of America had a special fund out of which it paid ten per cent interest on all moneys that were left in the account for a year, we find nothing in the admissions which would sustain the defense of conspiracy to defraud the bank.

The case was fairly submitted to the jury in a charge that was clear and understandable. The questions of fact as between these parties were properly left for determination by the jury.

The judgment and order appealed from should be affirmed, with costs.

MARTIN, J., concurs.

Judgment and order reversed and a new trial ordered, with costs to the appellant to abide the event.