MILTENBERG AND SAMTON, INC., Respondent, *v.* JOSEPH MALLOR, Individually and Doing Business as MALLOR BROKERAGE Co., et al., Appellants.

First Department, May 8, 1956.

*Leonard H. Mandel* of counsel (*Robert R. Slaughter* with him on the brief; *Paskus, Gordon & Hyman,* attorneys), for appellants.

*Alexander E. Rosenthal* for respondent.

BOTEIN, J. P.   Plaintiff seeks to enforce a '' guaranty '' by defendant to be responsible for the consequences if a bare-faced scheme to deceive the consuming public went awry.

Defendant, a food broker, sold 2,000 cartons of canned Atlantic coast river herring to plaintiff, who bought the herring for resale to a customer in Egypt.  The negotiations and the written terms of sale contemplated that the cans of herring should be labeled as California mackerel.  At that time mackerel was in short supply and sold for about twice the price of herring.

Concededly, this mislabeling was agreed or insisted upon by all the participants in the transaction — plaintiff, defendant, the packer and the Egyptian customer. The only persons touched by the sale who would be unaware of the deception would be the ultimate consumers in Egypt.

However, in attaching the false labels, the packer negligently failed to remove the herring labels from a number of the cans, and merely pasted the mackerel labels over them. This double labeling was discovered upon inspection at dockside. Plaintiff nevertheless accepted delivery, loaded the cans aboard ship and sent them to the Egyptian purchaser.

Plaintiff, expressing apprehension that discovery of the underlying herring labels would cause the Egyptian purchaser to reject the shipment, refused payment. Finally, to secure payment, defendant and the packer signed the so-called guaranty upon which plaintiff bases this action, in which defendant agreed to be " responsible for any and all consequences due to the fact that the River Herring label was not removed from the tins ".

As apprehended by plaintiff, the Egyptian purchaser withheld payment because of the double labeling, complaining that " According to local regulations, we cannot sell canned herrings under the name of Mackerel ". Plaintiff gave its Egyptian customer an allowance of about $8,000, and upon refusal of defendant to pay that sum under the guaranty agreement, it commenced this action.

Both parties moved for summary judgment, and Special Term granted judgment for plaintiff, rejecting the defense of illegality on the ground that the Federal statutes did not proscribe the arrangement, since the goods were packed for export and were never introduced into intrastate or interstate commerce for domestic use.

Defendant contends that the complaint must be dismissed because the guaranty agreement is repugnant to public policy and also because it is violative of the Federal statutes. We believe that either ground precludes enforcement of the contract.

Sometimes a transaction is so plainly prejudicial to the public good, so clearly repulsive to every concept of morality and fair dealing, that a court need not look further to ascertain whether it is also proscribed expressly by some statute. In such a case, and this is one, a judge has no misgiving as to whether his own notions of morals and decency reflect accurately the sentiment of the street. " In many of its aspects the term ' public policy ' is but another name for public sentiment and, as that is often transitory or shifting, it lacks the permanency upon which fixed principles of law are, or should be, based. There are, however,

other phases of public policy which are as enduring and immutable as the law of gravity. One of them is that, as applied to the law of contracts, courts of justice will never recognize or uphold any transaction which in its object, operation or tendency is calculated to be prejudicial to the public welfare. That sound morality and civic honesty are corner stones of the social edifice is a truism which needs no re-enforcement by argument." (*Veazey* v. *Allen,* 173 N. Y. 359, 368.)

Our task is made easier by the fact that the parties make no effort to place a patina of propriety on the transaction. The complaint possibly permits of an inference that payment was refused in Egypt because of the unmerchantable quality of the herrings themselves; but plaintiff, with disarming candor, rejects so honorable a condition and alleges in its bill of particulars that " The fact that the canned fish contained double labels which were contradictory rendered it not fit, suitable or merchantable in Egypt ". This would appear to reduce the complaint to the proposition that by reason of the inept labeling the merchandise was unfit for the purpose of deception of the public.

Surely, it is too fundamental to require elaboration that the public welfare demands that consumers be properly informed as to the type and quality of the food they eat and that they not be mulcted by gross misrepresentations. The Government affords some measure of protection to the public by discouraging contracts that contemplate cheating or defrauding members of the public through refusing to enforce them. " As has been frequently said, the courts, in refusing to enforce these agreements, does so, not because it desires to relieve one of the parties to such an agreement from the obligation that he assumes, but because of the fact that the making of such an agreement is an injury to the public, and that the only method by which the law can prevent such agreements from being made is to refuse to enforce them." (*Coverly* v. *Terminal Warehouse Co.,* 85 App. Div. 489, 491.) In such a case a court will leave the parties as it found them (*Hull* v. *Ruggles,* 56 N. Y. 424; *Drake* v. *Lauer,* 93 App. Div. 86; *Weld* v. *Postal Telegraph-Cable Co.,* 199 N. Y. 88; *Reiner* v. *North American Newspaper Alliance,* 259 N. Y. 250; 6 Corbin on Contracts, § 1518; Restatement, Contracts, § 512). " It is well-settled law that parties to a fraudulent or illegal transaction who are *in pari delicto* may not invoke judicial aid to undo the consequences of their illegal acts " (*Flegenheimer* v. *Brogan,* 259 App. Div. 347, 349). .

" Humanity is entitled to know what it buys and consumes," the court said in *Church* v. *Proctor* (66 F. 240, 245) a case also involving a contract to buy and sell a cheaper fish and label it

as mackerel. "So a sale or agreement to sell any article which is so deleterious to public health as to be inimical to the public welfare, or is so deceptively labeled or prepared as to be likely to defraud persons subsequently induced to buy it, is invalid" (3 Williston on Sales [Rev. ed.], § 674-b, p. 624). *Materne* v. *Horwitz* (101 N. Y. 469) a case markedly similar to this one, involved an agreement by the plaintiff to sell the defendant domestic sardines, which, however, were to be labeled as French sardines. The Court of Appeals made short shrift of the contract (p. 471): "It is, therefore, apparent that it was part of the contract that an unlawful object was intended, of which both parties were cognizant, and that it was designed by them, under the contract, to commit a fraud and thus promote an illegal purpose by deceiving other parties. In such a case the courts will not aid either party in carrying out a fraudulent purpose."

Plaintiff contends that the Federal Government has preempted the field in the regulation of shipment of food and drugs in interstate and foreign commerce by passage of the first Food and Drug Act in 1906, and that such legislation has ever since enunciated the public policy of both country and State. Subdivision (d) of section 801 of the Federal Food, Drug, and Cosmetic Act, as amended (U. S. Code, tit. 21, § 381, subd. [d]), provides: "A food, drug, device, or cosmetic intended for export shall not be deemed to be adulterated or misbranded under this Act if it (1) accords to the specifications of the foreign purchaser, (2) is not in conflict with the laws of the country to which it is intended for export, and (3) is labeled on the outside of the shipping package to show that it is intended for export." Plaintiff asserts there is no adequate showing that mislabeling a food product is in conflict with the laws of Egypt.

The statute was evidently designed to ease technical barriers to exporting certain commodities. However, the practice contemplated by the parties' agreement is so grossly corrupt that it must carry universal condemnation. We need not reach the question whether this law, reflecting heightened legislative awareness of government's responsibility for the dignity and well-being of the citizen, condones such a practice. Nor need we consider the authorities cited by defendant to the effect that Egypt prohibits the misbranding of products for sale. Plaintiff bases its entire claim for recoupment under the guaranty agreement on the Egyptian purchaser's statement that "According to local regulations, we cannot sell canned herrings under the name of Mackerel". The complaint cannot survive a disclaimer of the validity of the basis upon which it made a settlement with

its Egyptian purchaser, because it was for the loss suffered pursuant to that settlement that plaintiff has brought this action upon the guaranty agreement.

The order granting plaintiff's motion for summary judgment should be reversed and the defendant's motion for summary judgment dismissing the complaint should be granted.

Cox, Valente and Bergan, JJ., concur.

Order unanimously reversed, with $20 costs and disbursements to the appellants, plaintiff's cross motion for summary judgment denied, and the motion of the defendant for summary judgment granted, and judgment is directed to be entered in favor of the defendants dismissing the complaint herein, with costs.