Abraham J. Gellinoff, J.
The Attorney-General has brought an action to dissolve the corporate defendant and to enjoin all defendants from engaging in certain allegedly fraudulent acts (Executive Law, § 63, subd. 12; Business Corporation Law, § 1101). Pending trial of the action, the Attorney-General makes this application for a preliminary injunction and the appoint *555 ment of a temporary receiver (Business Corporation Law, §§ HI3,1115).
The documents obtained by the Attorney-General through a subpoena duces tecum (Executive Law, § 63, subd. 12), demonstrate that the only business actually conducted by defendants is the preparation and sale of term papers to high school and college students. Indeed, the word “ termpapers ” is featured in the name under which each of the defendant companies does business — Termpapers, Inc.; New York City Termpapers, Inc.; Termpapers Unlimited of New York, Inc.; and Termpapers Unlimited of New York.
The words “ term paper ” mean “ a major written assignment in a school or college course representative of a student’s achievement during a term ” (Webster’s Third New Int. Dictionary). A term paper measures a student’s ability to research and write upon a particular subject, and the grade he receives on a term paper is a substantial factor in determining the grade he receives in the course. The satisfactory completion of the term paper is generally a requirement for obtaining course credit for the particular course involved; and a certain number and type of course credits are necessary in order to obtain a diploma, degree or certificate.
Almost all of defendants’ customers are students who have been attracted either through advertising in college newspapers, or by “ fliers ” given to passersby at college campuses. The advertisements, with the motto, “We give results ”, proclaim: “ Great savings. 10,000 papers at $1.90 a page.” More recently, the advertisements have added the statement, “ Twice as many papers as last semester with summaries and grade levels on every one.”
The “flier ” states: “ Do you have a term paper assignment that’s a little too much work? Are you cramped for time with a nightmarish deadline closing in? Let us help you. We have a team of professional writers who can handle any subject. Our papers are custom made, and professionally typed. We offer the most economical work anywhere, at no sacrifice in quality or service to you.” At the bottom of the “ flier ” is the statement, ‘ ‘ This material is intended to be used for research and reference purposes only.”
The student may respond to defendants ’ advertising in person or by mail. If he comes to their office, he sees three signs on the wall, reading: “ We don’t guarantee grades ”, “ We don’t condone plagiarism ” and “No refunds.” The student receives *556 a form to fill out, which requests, besides the student’s name and address, the name of his school, course and instructor. Although the form bears the statement, ‘ ‘ For research and reference purposes only,” it also provides a large blank space in which the student is requested to state the number of pages the term paper should have, to give a “ detailed description of desired paper,” and to list “ references left behind ” — textbooks and other data for use in preparing the term paper. The student pays the required fee in advance; $1.90 per page for a term paper defendants have in stock, or $3.85 per page for a custom written term paper ($4.85 for a “ rush ” job). About a week later, he receives a fully written term paper.
The term papers are produced for defendants by freelance writers who are college graduates with some expertise in the subject involved in the particular paper. The writers have signed a contract with defendants, promising ‘ ‘ to submit research and writing that is commencerate [sic] in quality with work sufficient to be accepted in a Graduate Program at an accredited University.” (Emphasis added.) Additionally — and ironically — each writer promises “that all work he produces and submits will be original and the products of his own research and writing, and the final product will not be work prepared for him by others.”
The Attorney-General, pursuant to his statutory authority to “ take proof and make a determination of the relevant facts and to issue subpoenas in accordance with the civil practice law and rules ” (Executive Law, § 63, subd. 12), has taken the testimony of various customers of defendants. These students, constituting a fairly representative sample of defendants’ customers, testified that they submitted the defendants’ product, either in whole or in substantial part, as their own work, and received grade credit for it (or, if they did not, it was only because the paper was delivered too late to be submitted).
Subdivision 2 of section 224 of the Education Law, so far as here pertinent, provides: “No person shall * * * attempt to obtain by fraudulent means any diploma, certificate or other instrument purporting to confer any literary, scientific, professional or other degree ”. A violation of the section is a misdemeanor and “ any person who aids .or abets another # * * to violate the provisions of this section ” is “ liable to the same penalties ” (Education Law, § 224, subd. 3).
Any student who submits a “ ghost-written ” term paper as his own, cheats. There is, conceptually, little difference between *557 the ‘ ‘ ghost-written ’ ’ term paper and the copied examination paper or the hiring of another to take an examination in place of a student. Any student, therefore, who submits as his own work a term paper bought from defendants, gets credit for a course through fraud, and thereby attempts to obtain his diploma or degree by ‘ ‘ fraudulent means ” (Education Law, § 224, subd. 2); see, also, Education Law, § 225). 1 And if defendants sell term papers to students, with reason to believe that the students intend to submit them as the students’ own work, then defendants are aiding and abetting the students to attempt to obtain their diplomas or degrees by “ fraudulent means ” (Education Law, § 224, subd. 3).
The court has before it many samples of the order forms filled out by defendants’ customers. In the blank space where the customer is requested to furnish a ‘ ‘ Detailed Description of Desired Paper ’ ’ one student, after a lengthy analysis of the subject matter, informs defendants: ‘1 Footnotes and bibliography are required. Plagiarism must be carefully avoided, as the professor knows the criticism of Donne exceedingly well. The paper should be well planned, well organized and should indicate serious thought. The paper must be able to withstand aggressive and hostile examination. It will be carefully read and evaluated.” Another student says he “needed 15 references. Bibliography in alphabetical order.” Another, informing defendants that the paper must be written “ in Spanish ”, also adds, “ Accents may be written in pencil.” Still another, apparently leaving nothing to chance, instructs defendants to “leave name on paper blank,” while another emphasizes that the ‘ ‘ footnotes must be on a separate page at the end of the paper * * * not at bottom of page.”
Other order forms contain similar instructions:
1 ‘ The paper must be at least 2000 words and at least 10 pages plus an additional page for bibliography. Footnotes are required. This paper is for a graduate English course and must develop a thesis. Both primary and secondary sources must be used.” (Emphasis added.)
‘1 Please use many recent references ’ ’ [Emphasis in original]
“ I need code number 1281. It is an 8 page Shakespeare paper relating to two tragic characters. I need the paper for Prof, [name omitted], English [title omitted] class at Queens College. Please let me know if anyone had used this paper for him before.” (Emphasis added).
*558 “ If possible, try to make it as evaluative and interpretive as possible. This is an advanced course, so led [sic] the writer not be afraid thats [sic] it to [sic] fancy. Make it as best [sic] and as fancy as you possibly cam.” (Emphasis added.)
‘ * Do not make the language too flowery. ’ ’
“ Must be backed up with actual case problems listed in any set of law books. If you cannot back up with actual noted case problems — void and return money.”
“ Paper being written for male college junior.”
‘ ‘ I will supply cover sheets and the bibliography. * * *
Do the paper in Outline form — It must be good as you can see by her [the instructor’s] remarks.” (Emphasis added.)
“ Paper should be broad and simple for undergraduate course.”
“ Any topic, but I would most prefer a paper on human nature in “ The Discourses ”. (Emphasis added.)
“ Not to be too general. Specific area up to writer. Research required — footnotes please. No bibliography. Margins — 1%" each side, 2" top, 1" bottom, double spaced.” (Emphasis added.)
These instructions show that the student is plainly telling defendants that he intends to palm off the term paper he receives from the defendants as his own. And these instructions — furnished in response to defendants’ request on its order form for a “Detailed Description of Desired Paper” — also show that defendants recognize the student’s avowed purpose to palm off defendants’ term paper as his own. Indeed, John Frederick Magee, formerly defendants’ administrative assistant, testified before the Attorney-General that defendants’ purpose in requesting the students to list their school, course and instructor on the order form, is to enable the student to ‘1 use the paper verbatim ” without fear that someone else in the same course will submit an identical paper to the same instructor. Defendants’ term papers are not mere outlines (unless that is what the student requests), nor are they in the form of reference guides; they are fully written term papers. The custom made papers, prepared according to the “ detailed description,” are typed on plain white paper, without any indication of their source or authorship. All a student has to do with the custom-made paper is append his name and submit it. Any doubt that defendants know the students buy their term papers in order to submit them as the student’s own scholastic achieve *559 ment, is dispelled by the agreement defendants exact from their writers, to submit ‘1 work sufficient to be accepted in a Graduate Program at an accredited university.”
Defendants’ advertising actively encourages the submission of their product as the students’ own work. Their “flier” — advertising “ custom made, and professionally typed ” term papers by “ professional writers who can handle any subject,” for students who are “ cramped for time ” with an “ assignment that’s a little too much work,” and a “ nightmarish deadline ” — urges a student to have his scholastic work done for him instead of doing it himself. In their recent newspaper advertising, defendants claim to be able to provide “ twice as many papers as last semester with summaries and grade levels on every one” (emphasis added). This obviously conveys the impression that students who have submitted defendants’ papers in the past have received good grades. It lures students into believing that, by purchasing defendants’ term papers rather than doing the work themselves, they can be assured of creditable grades.
Defendants protest they did not know they were encouraging fraud. They point to their various disclaimers — “ This material is intended to be used for research and reference purposes only; ” “ We don’t condone plagiarism.” Yet in the very same breath they boast of the grades their former term papers have received. Their warning, “We don’t guarantee grades,” only accentuates their awareness that some students could be relying on defendants’ term papers for their grades.
The defendants liken themselves to the Encyclopedia Britanmca Library Research Service. Each of the Britannica pages is on stationery bearing the Encyclopedia Britannica letterhead. Their reports consist exclusively of quoted excerpts from source materials, at the conclusion of which the author and the title of the quoted source are documented. Their reports do not contain any original writing whatsoever. The average length of their reports is four to six pages, the length being determined by themselves. Their research service is available only to purchasers of their encyclopedia, not to the general public through sale or otherwise. Britannica has on occasion received written requests for term papers, with detailed instructions down to the type of paper to be used and the size of the margins. Requests of this nature are uniformly rejected. The function of their report is to furnish the subscriber with excerpts from documented source materials which he may then use as a basis for Ms own original research and writing.
*560 The defendant Saksniit, president and office manager of defendant organizations, states in a reply affidavit that “ students were informed that [specific] requests could not be complied with, that the research and reference report would be prepared in the normal manner regardless of specific instructions. If, in the normal procedure entertained by our staff and/or writers, the research and reference report delivered did comply with some of the numerous requests, it was purely coincidental. ’ ’
In light of the other indisputable evidence, this unsupported assertion is rejected by the court as unbelievable.
The evidence as to the nature and conduct of defendants’ business is both direct and circumstantial. The test as to its sufficiency is ‘1 whether common human experience would lead a reasonable man, putting his mind to it, to reject or accept the inferences asserted for the established facts ” (People v. Borrero, 26 N Y 2d 430, 435 [1970]). Applying that test, the court is convinced that defendants are engaged in the business of selling term papers to students, thereby knowingly aiding and abetting them to attempt to obtain by fraudulent means a diploma, degree or certificate, in violation of subdivisions 2 and 3 of section 224 of the Education Law.
The complaint seeks a dissolution of the corporate defendant on the ground that the “business activities of defendants,” have the 1 ‘ direct capacity and tendency of subverting the process of learning and encouraging intellectual dishonesty and cheating, ’ ’ and are therefore contrary to the ‘ ‘ public policy of this State in maintaining and preserving the integrity of the educational process.”
“Education,” wrote James Madison, “is the true foundation of civil liberty.” Assisting and promoting plagiarism— the most serious academic offense — strikes at the core of the educational process, and thus at the very heart of a free society. Doing a student’s work for him not only deprives him of the valuable disciplines of the learning process, but tends to destroy his moral fibre by lending credence to the all too prevalent notion that anything, including a college degree, can be bought for a price.
The damage which defendants’ business does to the fabric of the scholastic community is dramatically made clear in a *561 plea from a young college student who writes to the AttorneyGleneral urging action :
‘ ‘ I am in competition with many students for entrance into a medical school. Spaces are few and the many students make the competition fierce. Only one student will occupy a seat desired by many, and he will be the student with the best grades.
“ The situation is tight enough as is, but what chance do I stand if my independent work (term papers) must compete not with those of my peers but with those of professionals — people with Masters and even Doctorates in the areas in which they write? I am subtly being■ blackmailed into using their immoral services.
“ An ironic development is the distrust my instructors have developed toward any above-average term paper I submit.
“ Sir — can your office do anything to relieve this injustice? I do not believe I am exaggerating if I claim that my future and my integrity are at stake.” (Emphasis added.)
The Legislature of our State has enacted laws to prevent fraud in obtaining degrees or diplomas (Education Law, § 224), and to guard the sanctity of the scholastic examinations (Education Law, § 225). It has thus declared it to be the public policy of this State that the integrity of the educational process should be protected and preserved. Whenever “ our courts are called upon to scrutinize a [business] * * * which is clearly repugnant to sound morality and civic honesty, they need not look for a well-fitting definition of public policy ” (Veazey v. Allen, 173 N. Y. 359, 368 [1903]).
The business defendants are conducting is morally wrong. It subverts the learning process and encourages intellectual dishonesty and cheating. It is directly opposed to the declared public policy of our State. It exceeds the purposes for which the corporate defendant was formed as set forth in its certificate of incorporation and is ultra vires (see State of New York v. Abortion Information Agency, 37 A D 2d 142 [1st Dept., 1971]).
The defendant Saksniit and defendant Termpapers, Inc. appear to be doing business under the purported corporate or assumed names of New York City Termpapers, Inc., Term-papers Unlimited of New York, Inc., and Termpapers Unlimited *562 of New York. These latter companies are without authority to do business in New York. The use df those names is a fraud (Business Corporation Law, § 109, subd. [a], pars. [2], [3]; General Business Law, § 130, subd. 9).
In light of the foregoing, the Attorney-General’s motion is granted in all respects. (See State of New York v. Abortion Information Agency, 69 Misc 2d 825 [Sup. Ct. N. Y. County 1971], affd. 37 A D 2d 142 [1st Dept., 1971]; State of New Yorh v. Remedial Educ., N. Y. L. J., Feb. 15, 1972, p. 16, col. 7 [Sup. Ct. N. Y. County, 1972].) All defendants are enjoined, during the pendency of this action, from carrying on, conducting or transacting business as sellers of essays, theses, term papers or Either school assignments. They are enjoined from advertising, soliciting, accepting, delivering and contracting for the production and sale of term papers or other research material to students. Except with the permission of and under the further order of this court, the defendants and the officers and directors of the defendant companies (if there be any purporting to act), are enjoined from and may not pay out or cause to be paid out any of the money of the corporate defendant Termpapers, Inc., nor any money of the other companies under which it or defendant Saksniit operates, to wit, New York City Termpapers, Inc., Termpapers, Unlimited of New York, Inc. and Termpapers Unlimited of New York; and Termpapers, Inc. and said other companies and its officers and directors (if there be any purporting to act), and defendant Saksniit may not sell, transfer, assign or deliver, or cause to be sold, transferred, assigned or delivered the property of Termpapers, Inc. or of the other afore-mentioned defendant companies under which names Term-papers, Inc. or defendant Saksniit operates (Executive Law., § 63, subd. 12; Business Corporation Law, §§ 109,1115; General Business Law, § 130).
A temporary receiver will be appointed to preserve the assets of the corporation Termpapers, Inc. and of the other aforementioned companies, with the usual powers and duties of tern *563 porary receivers (Business Corporation Law, § 1113; art. 12).
Settle order on one day’s notice, with provision for an early trial as the parties may agree, furnishing the court with suggestions as to the bond of the receiver.